ORIGINAL

VENETIA K. CARPENTER-ASUI
A Law Corporation

VENETIA K. CARPENTER-ASUI    6901
Haseko Center
820 Mililani Street, Suite 812
Honolulu, Hawaii 96813
Telephone:  (808) 523-6446
Facsimile    (808) 523-6727

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 21 2006

at 11 o'clock and 46 min. P M
SUE BEITIA, CLERK

Attorney for Plaintiff
LINDA D. SEKIYA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LINDA D. SEKIYA, <br><br> Plaintiff, <br><br> vs. <br><br> DONALD H. RUMSFELD, <br> officially as secretary of Defense, <br><br> Defendant. | Civ No. 04-00297 DAE/KSC <br><br> PLAINTIFF'S MEMORAN-DUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, FOR SUM-MARY JUDGMENT AND IN THE ALTERNATIVE TO STRIKE JURY DEMAND ON PLAINTIFF'S FAMILY AND MEDICAL LEAVE ACT CLAIM; CERTIFICATE OF SERVICE <br><br> Hearing: <br> Date: March 13, 2006 <br> Time: 10:30 a.m. <br> Judge: Hon David A. Ezra <br><br> Trial: 5/2/06 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS, FOR SUMMARY
JUDGMENT AND IN THE ALTERNATIVE TO STRIKE JURY
DEMAND ON PLAINTIFF'S FAMILY AND MEDICAL LEAVE ACT
CLAIM**

Comes now, LINDA D. SEKIYA ("Plaintiff"), Plaintiff in the
above-entitled case, and files Plaintiff's Memorandum in Opposition to
Defendant's Motion to Dismiss, for Summary Judgment and in the
Alternative to Strike Jury Demand on Plaintiff's Family and Medical Leave
Act Claim, filed on December 12, 2006.

I.    **FACTS**

1.    On July 13, 1975 Plaintiff was hired by Defense Reutilization
& Marketing Office-Hawaii (DRMO-HI), Defense Logistics Agency
(DLA), United States Department of Defense (DOD) as a Property Disposal
Technician, GS-1107-07.  (Ex A; Decla Pl)

2.    Throughout Plaintiff's employment, she had no disciplinary
actions.  (Ex B; Decla Pl)

3.    Plaintiff received successful to superior performance ratings
during her employment.  (Ex C; Decla Pl)

4.    Plaintiff received awards during her employment.  (Ex D;
Decla Pl)

5.    Plaintiff had a medical history of migraine/tension headaches
(lasting 3-5 days), ulcers, and chronic back pain due to an injury dating back
to November 21, 1985.  Plaintiff was treated for these by Michael J. Inada,
M.D. (ex E; Decla Pl).

6.    On or about March 1990, the new DRMO Chief, Mr. Edwin M.
Domdoma, arbitrarily lowered approximately a dozen, including Plaintiff's,
performance rating.  Chief Domdoma had been on-the-job for

2

approximately one (1) month. According to regulation Chief Domdoma was required to be in his position for at least ninety (90) days before making changes to performance ratings. Plaintiff filed an IG complaint. Chief Domdoma was ordered to reinstate Plaintiff's original ratings. After Plaintiff's complaint, Chief Domdoma retaliated against Plaintiff. Chief Domdoma stated "I don't like females who stand up to me." This statement was witnessed by co-workers Carol Ah Hee (ex O) and Diane Marumoto. (Ex F; Decla Pl)

7.    On or about  December 1999 Plaintiff began suffering from an additional disability -- "bone spur and chronic right plantar fasciliits" which continues to the present. Plaintiff was treated for this by Michael K.Y. Chun, M.D., (ex G; Decla Pl); Douglas P. Hagen, D.O. (ex DD; Decla Pl); Ramakrishna Kosuri, M.D. (ex HH; Decla Pl); Bernard M. Portner, M.D. (ex II; Decla Pl); Michael K.Y. Chun M.D. (ex G; Decla Pl); and Marty & Charlie (ex JJ; Decla Pl).

8.    On or about January 2000, Dr. Michael Chun, a Podiatrist, ordered Plaintiff to be off her feet for one month. During that time, Plaintiff's supervisor, Mr. Godfrey Ching telephoned Plaintiff almost daily asking when she was returning to work. Plaintiff informed him that she was taking painkillers and that she would return as soon as the doctor cleared her. Supervisor Ching was in possession of medical certificates verifying Plaintiff's medical conditions. Supervisor Ching stated, "just cut your leg off already!" (Ex G; Decla Pl)

9.    On October 17, 2000 Supervisor Ching approached Plaintiff and stated, "what's the status of your foot condition? It seems like you've been on light duty for a long time. They (co-workers) might think you're getting preferential treatment. When do you anticipate recovery? When do

3

you anticipate permanent recovery?" Plaintiff replied that he had seen the
medical certificates and the doctors cannot make predictions, but the
condition appears to be chronic, as Plaintiff had four different conditions
occurring in her right foot (external inflammation, bone spur, plantar
faciliitis, plantars warts). Supervisor Ching looked disgusted and walked
off. (Ex H; Decla Pl)

10. On October 19, 2000 Supervisor Ching stated to Plaintiff,
"your condition has been too long. Do you need the crutches?" Plaintiff
replied, "of course, without it I can't walk. There is no way I can put any
pressure on my right foot." Supervisor Ching replied, "seems like they
(Chief Domdoma) thinks you're just faking or dragging this on." Plaintiff
replied, "I am taking maximum pain killers (Celebrex 200 mg) twice a day."
Supervisor Ching was not interested. (Ex I; Decla Pl)

11. On or about November 27, 2000, Plaintiff's father was
diagnosed with cancer. He lived independently and Plaintiff handled his
needs and all of his affairs as his only child here in the State of Hawaii.
During that time Plaintiff requested extra time off to care for her dying
father. Plaintiff informed Supervisor Ching that she was caring for a
terminally ill parent, he signed her leave request forms, and he did not
inform Plaintiff about her rights under the Family Medical Leave Act.
Plaintiff used her annual sick leave to care for her terminally ill father. On
February 11, 2001 Plaintiff's father was placed in Hospice and on March
23, 2001 he passed away. (Ex I; Decla Pl)

12. On or about December 5, 2000, Supervisor Ching asked
Plaintiff for a medical certificate stating how long Plaintiff would be on
crutches. Plaintiff replied, "I have an appointment for a bone scan."
Supervisor Ching again stated, "just cut your leg off already." (Decla Pl)

4

13.     On December 7, 2000, Plaintiff overheard Deputy Lilinoe
Miyamoto in Supervisor Ching's office asking what the results of the "bone
scan" were.  Supervisor Ching stated that there was no indication yet and he
would see the report later.  (Decla Pl)

14.     On December 7, 2000, Supervisor Ching stated to Plaintiff, "if
the doctor sees no sign of improvement you should consider medical
retirement."  Supervisor Ching began reciting retirement formulas to
encourage Plaintiff to retire.  Plaintiff informed Supervisor Ching that she
was not interested in retirement and that she could still perform her job.
(Decla Pl)

15.     On December 8, 2000, Supervisor Ching once again informed
Plaintiff that she should consider medical retirement.  (Decla Pl)

16.     On December 13, 2000, Supervisor Ching told Plaintiff that he
telephoned her home because she was not at work.  Plaintiff explained that
she had 2 hours to call in after the start of her shift and that she was on her
way in to work in heavy traffic.  Supervisor Ching again asked Plaintiff for
medical records and asked "can't your doctor say how long you will be on
crutches?  Chief Domdoma wants to know."  Plaintiff explained that the
doctor could not predict that and she had just received a cortisone shot
which has not helped her.  Plaintiff explained that she was going for a
follow up visit.  Supervisor Ching replied in a sarcastic tone, "does this
doctor know what the Hell he's doing?  Ah, just cut your leg off already!
Can't you walk without the crutches?  Can't you use a cane?"  (Decla Pl)

17.     On February 11, 2000, Plaintiff's father was admitted to a
hospice care facility.  (Decla Pl)

18.     On March 23, 2001, Plaintiff's father passed away.  Plaintiff
was summoned to the hospice care facility at 3:00 a.m. and her father died

5

shortly after her arrival. Plaintiff took off from work in order to see to the funeral arrangements. (Decla Pl)

19.     On March 26, 2001, Plaintiff returned to work. Supervisor Ching immediately accosted her and stated, "I called hospice looking for you on March 23, 2001 to find out if you were coming in to work!" Supervisor Ching demanded medical certification for Plaintiff's absence on March 23, 2001. (Decla Pl)

20.     On March 31, 2001, Plaintiff's father's funeral service took place. (Decla Pl)

21.     On or about July 20, 2001, Supervisor Ching informed Plaintiff that her request to attend the pre-retirement seminar had not been approved yet, therefore, she would not be able to attend. Plaintiff requested annual leave for that day and paid for the training with her own money. Supervisor Ching stated, "you either stupid or you're rich. If you have so much money, give it to me and I'll teach you discipline". Chief Domdoma permitted other employees to attend training prior to approval. (Ex I,J,K,L; Decla Pl)

22.     On or about July 2001, the Agency held the pre-retirement seminar at the work site. The Agency was completely closed for the day. Plaintiff was denied attendance despite being fifty-four (54) years old with thirty-four (34) years of service. Chief Domdoma did not allow three other employees from the same branch to attend, who ranged in ages of 55 to 70 years of age with 20 to 30 years of service. Most of the Agency's younger employees were in attendance, while the older employees with the most seniority were barred. Co-worker Miles Saito attended the seminar even though he had attended one before. (Ex I,J,K,L; Decla Pl)

        a.     There were empty seats available for Plaintiff and the other older employees that were paid for but the employees did not show up.

6

Chief Domdoma sat in the seminar but refused to allow Plaintiff and the other older employees to sit in the empty seats. Chief Domdoma also invited Camp Smith employees to attend the seminar and paid for their attendance.

           b.     Plaintiff was interested in learning of the changes in the laws, health care, benefits, investments, TSP, and others. The seminar provided necessary pre-retirement planning information that applied to Plaintiff, yet younger employees not eligible to retire, were permitted to attend in her place. Chief Domdoma claimed that the employees who were not allowed to attend the seminar had attended it in 1997. The 1997 seminar and the Federal Week publications emphasize that employees cannot learn everything in one seminar, and should attend one at mid-career, five years prior to retirement, and just before retiring.

           c.     Three other employees also filed EEO complaints regarding this incident. Mr. Miles Saito was permitted to attend although he had previously attended the seminar on or about 1997, was not planning on retiring, and was not eligible to retire. Chief Domdoma authorized younger employees with less years of service and newly hired employees to attend. The Agency spent exorbitant amounts on new office furniture, palm pilots, color printers, computers, travel, and training, but refused to approve $35.00 for each older employee to attend the retirement seminar. (Ex I,J,K,L; Decla Pl)

      23.     Although Plaintiff requested a reason for the Agency's refusal to allow her to attend the pre-retirement seminar in writing, she never received it. Three weeks later, in August 2001, Plaintiff was retaliated against when Supervisor Ching, acting upon instruction of Chief Domdoma, served her with a "Letter of Requirement" (ex M) alleging leave abuse. The

Letter of Requirement required Plaintiff to produce a medical certificate for each sick leave, even if only one hour. When Supervisor Ching summoned Plaintiff into his office, Plaintiff asked him if it would take long and he replied, "no, but you might SHIT when you see this!" (Ex M,I; Decla Pl)

24.    Plaintiff asked for evidence of leave abuse that led to the "Letter of Requirement" but received nothing. The Letter of Requirement stated that Plaintiff's leave for 2001 was "excessive." Plaintiff used less leave in 2001 than in the past and her Leave and Earnings Statements verify this. (Ex N) Plaintiff's leave requests were approved and there were legitimate reasons for being out of work such her disabilities and the care of her terminally ill father.

|  | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|
| Annual Leave | 234 | 226 | 252 | 145 |
| Sick Leave | 64 | 98 | 106 | 56 |
| LWOP | 0 | 0 | 0 | 36 |

(Ex N; Decla Pl)

25.    From August through September 2001 Plaintiff was out of work on leave without pay ("LWOP") instead of the Family Medical Leave Act, as Plaintiff was entitled to. (Ex N; Decla Pl)

26.    From January 2000 through October 2001, on a weekly basis, Supervisor Ching would humiliate Plaintiff by stating: "just cut your leg off already!" Supervisor Ching would also make this statement in the presence of Plaintiff's co-workers in the morning meetings. This statement was witnessed by Plaintiff's co-workers:

> a.    Carol Ah Hee, (ex O; ex P p18 lines 9-25; p19 lines 1-22; p25 lines 7-16; p28 lines 12-17)

> b.    Garry Fountain (ex P p56 lines 3-25; p57 lines 1-23)

8

     c.     Ed Cubarubbias (ex P p70 lines 12-25; p71 lines 1-16)

     d.     Shizuo Yanagi (ex P p32 lines 9-20)

27.    The turnover rate was extremely high for an Agency consisting of fifty (50) employees. During the previous twelve (12) years, since Chief Domdoma arrived, approximately forty (40) employees left work. Threats such as: "your job is on the line" and "if you don't like it there's the door" were very common. Chief Domdoma stated he had an "open door" policy. However, after meeting with him employees were targeted for retaliation and forced to resign or retire. (Ex Q; Decla Pl)

28.    Due to Chief Domdoma and Supervisor Ching's actions, on or about August 2001, Plaintiff's psychiatrist Mark H. Bernstein, M.D. increased Plaintiff's tranquilizer dosage due to work related stress, anxiety, and insomnia. Despite taking anti-depressants and receiving supportive counseling, the intolerable work conditions made it impossible for Plaintiff to cope with the hostile working environment. The intensity of her migraine and tension headaches was unbearable and Plaintiff suffered a relapse of depression. (Ex R; Decla Pl)

29.    On or about September 2001, Plaintiff's psychiatrist Dr. Mark Bernstein advised her not return to work. (Ex R; Decla Pl)

30.    Supervisor Ching constantly asked Plaintiff for medical certificates despite her telephoning in daily. Finally, Plaintiff asked him, "what's your greatest concern?" to which he replied, "I don't know!" (Ex I; Decla Pl)

31.    Plaintiff wrote letters of complaint to Congressman Neil Abercrombie, Vice Admiral Keith W. Lippert, Colonel John A. Marx, Honorable Alexis M. Herman, and Office of Communications and Legislative Affairs, reporting her "mixed case" complaint. (Ex U; Decla Pl)

32.    Due to the retaliation, discrimination, hostile work environment, and her doctor's advice, Plaintiff retired in October 2001, instead of her planned retirement date of October 2004 after her son graduated from college. (Ex V; Decla Pl)

33.    On or about October 2001, Plaintiff applied for unemployment compensation. Chief Domdoma and Supervisor Ching opposed Plaintiff's claim. After an appeal, unemployment benefits were granted to Plaintiff. (Ex W,X,Y; Decla Pl)

34.    Immediately after Plaintiff retired involuntarily, in December 2002, Mr. Ron Camara informed Plaintiff that her position was upgraded to GS-9 then GS-11. While Plaintiff was employed Chief Domdoma refused to upgrade it. (Ex Z; Decla Pl)

35.    Plaintiff filed an Informal EEO complaint on December 9, 2001 for: a) age discrimination, b) sex discrimination, c) disability discrimination, d) retaliation, e) Family Medical Leave Act violations ("FMLA"), and f) forced involuntary retirement. (Ex BB; Decla Pl)

36.    Plaintiff filed a Formal EEO complaint on January 24, 2002. (Ex CC; Decla Pl)

37.    Plaintiff filed a pro se disability discrimination and FMLA lawsuit in Federal District Court on May 6, 2004. (Ex EE; Decla Pl)

## II.    STANDARD OF REVIEW

"Summary judgment should be granted only if 'the pleadings, depositions, answers or interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" Fed. R. Civ. P. 56(c). "A genuine issue of material fact exists, and summary judgment is inappropriate, if there is a fact in contention which could affect

the outcome of the suit under the governing law, and the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Lindahl v. Air France, 930 F.2d 1434, 1436 (9th Cir. 1991).

Because in most employment discrimination cases direct evidence of the employer's discriminatory motivation is unavailable or difficult to obtain, the Supreme Court has set forth an indirect method of proof which relies on presumptions and shifting burdens of proof. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this familiar framework, to survive summary judgment in a disparate treatment case, a plaintiff must carry the initial burden of establishing a prima facie case of employment discrimination. Washington v. Garrett, 10 F.3d at 1432. By establishing the prima facie case, the plaintiff creates a presumption that the employer engaged in intentional discrimination. Texas Dep't of Community Affairs, 450 U.S. at 254. However, if the employer articulates a legitimate, nondiscriminatory reason for its employment decision, the presumption of unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742, 2749 (1993). The plaintiff must raise a genuine factual issue as to whether the employer's proffered reason is a pretext for discrimination. Washington, 10 F.3d at 1432. "If [the] plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to determine which story is to be believed." Id.

"Because intent is at issue in discrimination cases, summary procedures should be used 'prudently' and 'judiciously' in such cases." Rose v. Wells Fargo & Co., 902 F.2d 1417, 1420 (9th Cir. 1990); Foresberg v. Pacific Northwest Bell Telephone Co., 840 F.2d 1409, 1419 (9th Cir.

11

1988).  "We have previously explained that '[w]e require very little
evidence to survive summary judgment' in a discrimination case because the
ultimate question -- whether the employer intended to discriminate -- is a
pure question of fact which usually can be resolved only through a
'searching inquiry' conducted by the factfinder upon a full record.
Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104,
1111 (9th Cir. 1991).

## III.   DISABILITY DISCRIMINATION CLAIM

### A.   TIME LIMITS

#### 1.   29 CFR 1614.105(A)(2) PROVIDES THAT AN EXTENSION "SHALL" BE GRANTED TO THE 45 DAY TIME LIMIT

Plaintiff's EEO case is classified a "mixed-case" because it
encompassed discrimination claims for: 1) disability discrimination, 2) sex
discrimination, 3) age discrimination, as well as non-discrimination claims -
4) FMLA, and 5) involuntary retirement.  Defendant argues that Plaintiff's
case should  be dismissed because she failed to file an EEO complaint
within the 45-day time limit to file her discrimination claims.  (Def msj p3)
However, the law recognizes circumstances that require an extension to the
45-day time limit, 29 CFR 1614.105(a)(2) states:

> The agency or the Commission *shall* extend
> the 45-day time limit in paragraph (a)(1) of this
> section when the individual shows that he or she
> was not notified of the time limits and was not
> otherwise aware of them, that he or she did not
> know and reasonably should not have known
> that the discriminatory matter or personnel action
> occurred, that despite due diligency he or she was
> prevented by circumstances beyond his or her

12

> control from contacting the counselor within the
> time limits, or for other reasons considered sufficient
> by the agency or the Commission.

29 CFR 1614.105(a)(2) (emphasis added).

The EEO Investigator recognized that Plaintiff exceeded the 45-day time limit (ex AA), but noted that Plaintiff did report her claims in writing on September 25, 2001 to: 1) U.S. Congressman Neil Abercrombie, 2) Vice Admiral Keith W. Lippert at DLA Headquarters; 3) Colonel John A. Marx at Defense Reutilization and Marketing Service, 4) Honorable Alexis M. Herman, and 5) Office of Communications and Legislative Affairs (Ex U) which were well within the 45-day time limit and before she retired effective October 1, 2001. For those reasons, the EEO filed an EEO Informal Complaint (ex BB), and an EEO Formal Complaint (ex CC) on Plaintiff's behalf.

There are four (4) ways for a Plaintiff to establish a 29 CFR 1614.105(a)(2) exception, by showing: 1) that she was not notified of the time limits and was not otherwise aware of them; 2) that she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred; 3) that despite due diligence she was prevented by circumstances beyond her control from contacting the counselor within the time limits; or 4) for other reasons considered sufficient. 29 CFR 1614.105(a)(2). Plaintiff invokes numbers 1 and 3.

First, Plaintiff argues that she was not notified of the time limits and was not otherwise aware of them. Plaintiff had never filed an EEO complaint in the 34 years she was employed by the Federal government and did not know of any individual who had. (Decla Pl) Plaintiff did not have an attorney and was trying to obtain information on how to go about filing a

13

complaint on her own by writing to the five (5) persons/entities listed above. (Decla Pl) Plaintiff was not aware of EEO until she received a copy of a letter dated November 5, 2001 from the U.S. Department of Labor which advised her to contact an EEO office (ex FF) sent in response to Plaintiff's letters to the five (5) persons/entities whom she turned to for guidance (ex U).

There is absolutely no evidence to suggest that Plaintiff knew about the EEO and instead directed her discrimination complaints to the five (5) persons/entities listed above to deliberately sabotage her legal rights. Plaintiff's intent to file her complaint with the proper entity is evidenced by her communications with the EEO immediately after receiving the November 5, 2001 letter directing Plaintiff there. Plaintiff's first contact with EEO is undisputed to be on November 26, 2001. (Def's msj p4)

Second, Plaintiff next argues that despite due diligence by writing to the five (5) persons/entities listed above she was prevented by circumstances beyond her control from contacting the EEO within the 45-day time limit. It is undisputed that the above facts demonstrate the tight timeline within which Plaintiff took action to file her EEO complaint, albeit with the wrong Federal entities. Plaintiff cannot be faulted for that which she did not know. Defendant has presented no evidence that Plaintiff was ever notified about the EEO, what its time limits were, or how to go about determining whether her facts were such that should be filed with EEO until she received the letter dated November 5, 2001. (Decla Pl) Plaintiff would not have wasted so much time writing to the five (5) persons/entities listed above, and waiting for their responses, if she knew where to go for help. (Decla Pl) Here, Plaintiff did not even belong to a union that she could have gone to for help. (Decla Pl)

Thus, 29 CFR 1614.105(a)(2) mandates that the 45-day time limit "shall" be extended if the above are established. In this case Plaintiff should not be penalized when it was the Defendant who failed to notify Plaintiff that an EEO office existed that could assist her with her discrimination claims. The failure of Defendant to provide Plaintiff with the information she desperately sought -- should not be considered a failure of Plaintiff's. The notifications she did make on September 25, 2001 seeking information, as detailed above, were all well within the EEO 45-day time limitation. The failure here is on the shoulders of the Defendant, who failed to notify Plaintiff of her EEO rights.

## 2.    "EQUITABLE TOLLING" SHOULD BE APPLIED

Equitable tolling should be applied in this case. Title VII's administrative deadlines are susceptible to equitable tolling, see *Irwin v. Veteran's Admin,* 498 US 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), as are the time limits for bringing a claim under the Rehabilitation Act. See *Boyd v. USPS,* 752 F.2d 410, 414 (9th Cir. 1985). This Court examined equitable tolling in *Nimi-Montalbo v. White*, 243 F.Supp.2d 1109, 1120 (D. Haw. 2003), "[t]he timely filing of an EEOC charge is not a jurisdictional prerequisite to suit" citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 71 L.Ed.2d 234, 102 S.Ct. 1127 (1982); "[r]ather, we treat the [45 day] time limit as a statute of limitations, and it is subject to waiver, estoppel, and equitable tolling." *Boyd,* 752 F.2d 414. "The forty five day period may be extended if, for instance, the employee was not aware of the time limits, or did not know and should not have known of the discriminatory conduct." 243 F.Supp.2d at 393. For all of the reasons articulated above, equitable tolling should be applied to the 45-day EEO reporting time limit in this case.

## B.    DEFENDANT VIOLATED THE REHABILITATION ACT UNDER THE "DISPARATE TREATMENT" LEGAL THEORY

The Rehabilitation Act of 1973, s2 et seq., 29 USCA s701 et. seq.; 29 CFR s1614.504 is a precursor of the ADA. *Chev. USA Inc. v. Echazabal,* 536 U.S. 73, 122 S.Ct. 2045, 2050 (2002). It is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 USC s12101 *et seq* s12112(a). To establish a case of disability discrimination Plaintiff must show that she: 1) is disabled; 2) is a qualified to perform her job; 3) she suffered an adverse action because of her disability. *Snead v. Metropolitan Property & Casualty Ins Co.,* 237 F.3d 1080 (2001); *Saunders v. Arneson Prods., Inc.,* 91 F.3d 1351, 1353 (9th Cir. 1996).

### 1.    Plaintiff was disabled

The first element of Plaintiff's prima facie case is that she was a disabled person when she was employed by Defendant. "The ADA defines disability as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 124 S.Ct. at 517; 42 USC s12102(2).

### a)    Plaintiff had a physical impairment that substantially limited one or more major life activities

Here Plaintiff claims that during her employment she suffered from physical impairments that substantially limited one or more of her major life activities of walking and working, including: 1) migraines since age 10, 2) ulcers, 3) gastro intestinal problems, 4) right-foot problems including

16

external inflammation, bone spur, plantar facilitis, plantars warts (ex P p175 lines 5-25), 5) tension, 6) anxiety, 7) stress, and 8) insomnia (ex P p206 lines 3-7).

As of December 1999 Plaintiff began walking with 2 crutches (ex P p176 lines 6-8). As of about April 2002 Plaintiff reduced to walking with 1 crutch (ex P p176 lines 9-11). As of the MSPB hearing date Monday, December 6, 2004, Plaintiff still soaked her feet every night and still slept with a night splint on her right-foot (ex P p176 lines 1-2) and walked with at least one crutch for support. (Decla Pl)

Plaintiff suffered from migraine headaches from 2000 through 2001 (ex P p176 lines 14-16). In 2000 Plaintiff had migraines once a month from 3-5 days (ex P p176 lines 14-20), resulting in missed work due to their severity (ex P p176 lines 21-24), the symptoms included reaction to light, sound, and any type of movement would make her nauseous (ex P p176 lines 21-24). In 2001 Plaintiff's migraines continued (ex P p176 line 1 to p177 line 1). Their frequency increased from once a month to "at least twice a month" from 3-5 days (ex P p177 lines 2-8). The migraines increased from 2000 to 2001 due to "stress" (ex P p177 lines 9-10). Plaintiff felt tension, which affected the muscles in her neck and shoulders and that would cause her migraines to begin (ex P p177 lines 9-12). At times the migraines were so severe that she could not even drive (ex P p177 lines 10-14).

The stress that increased her migraines was the result of her being out of work in January 2000 on leave for a month per doctor's orders, complete bed rest, staying off her foot, and having her supervisor call her almost on a daily basis (ex P p177 line 22 to p178 line 1). That started to trigger a lot of things: she could barely get to the bathroom because she was in so much

17

pain, she couldn't get to the kitchen to get a cup of water, and there were times she actually crawled on all fours to go the bathroom because of her foot problems (ex P p178 lines 1-7). Plaintiff was also taking "maximum pain killers" medication to make her drowsy to help her sleep so she wouldn't feel the pain (ex P p178 lines 7-10).

Supervisor Ching telephoned Plaintiff "almost on a daily basis" when she was at home during the month of January 2000 (ex P p178 line 1). "It got to the point where she was just cringing every time the phone rang because it was such a chore for [her] to even get out of bed. I mean, I could not get out of the bed like a normal person, and that was a chore, just as much as it was a chore to even get to the bathroom." (Ex P p178 lines 14-19) When Supervisor Ching would call Plaintiff he would start off asking "well, how's you leg? he would continue to talk sometime of really no importance to work, but it would always end up with the remark, 'well, just cut your leg off.'" (Ex P p178 lines 20-25) Plaintiff could feel her blood pressure going up, she could feel her body tensing up, and it would create migraines, just the thought of having her leg cut off would cause her to "literally cringe." (Ex P p179 lines 5-8) Supervisor Ching "had a very sarcastic tone when he would say that and that remark was repeated to me so many times that it -- it was very cruel, very hurtful, that I'm just wondering, I don't know, you know, how anybody could say that to someone who's in pain. I mean, I was crawling on all fours." (Ex P p179 lines 15-19)

In February 2000, when Plaintiff returned to work, she was on "light duty" pursuant to her doctor's request. (Ex P p180 lines 1-4) Supervisor Ching immediately asked her for her "doctor's paper" even though she had been sending him medical certificates updating him to her condition and informing him of her follow-up doctor appointment dates. (Ex P p181 lines

18

2-6) Supervisor Ching also stated to Plaintiff that her co-workers may think
she was receiving preferential treatment. (Ex P p181 lines 13-24)
Supervisor Ching immediately asked Plaintiff when she anticipated
"recovery" and "permanent recovery." (Ex P p182 lines 1-8)  Plaintiff
replied that she did not know because the doctors could not give her a
projected date because she was not healing like a normal person (ex P p182
lines 6-8) her "recovery for anything and everything that I had was always
slow" (ex P p182 lines 19-23).  Supervisor Ching also commented that
Plaintiff's condition had been going on too long, suggesting that Plaintiff
was dragging it on, wanting to stay on light duty, but that wasn't the case,
she just did not heal. (Ex P p182 line 24 to p183 line 4)

   Supervisor Ching asked Plaintiff if she needed her crutches, to which
Plaintiff replied that she definitely did because there was no way she could
stand on her right foot. (Ex P p183 lines 5-7)  Supervisor Ching also stated
that Chief Domdoma thinks you're faking, dragging her disabilities along.
(Ex P p183 lines 8-10)  Supervisor Ching told Plaintiff that she should just
cut her leg off "continuously for a year and nine months, from January 2000
up until the time I retired" on October 1, 2001. (Ex P p190 line 21 to p191
line 1)  When Supervisor Ching told Plaintiff to cut her leg off she "felt so
humiliated. It's just a degrading remark and I thought it was so
unprofessional coming from a supervisor especially and I really didn't
appreciate it, not one bit at all." (Ex P p191 lines 10-16)  "He would just
kind of shrug and do this smirk, you know, like it's not a big deal and why
are you getting so upset." (Ex P p192 lines 1-6)

   On or about December 7, 2000 Supervisor Ching stated to Plaintiff
that if the doctor sees no sign of improvement she should just consider
medical retirement.  He was standing in front of her desk talking to her

about medical retirement and a couple of days later he did the same thing. (Ex P p192 lines 7-15) He stated, "if your leg is not getting better, why don't you go for medical retirement," and that was not in her mind at that point. (Ex P p192 lines 17-19)

On or about December 2000 Supervisor Ching also stated "can't your doctor say how long you'll be on crutches? Chief Domdoma wants to know?" (Ex P p193 lines 1-3) Plaintiff explained that she didn't know, that she had been going to see doctors on a regular basis, for the first 14 months she saw a podiatrist and had cortisone shots which did not work. (Ex P p193 lines 7-11) She changed to Portner Orthopedic Rehabilitation (ex II) and began improving with physical therapy but even Dr. Portner could not predict how much longer it would take for her to get to a point where she could actually walk on her own." (Ex P p193 lines 7-15) Supervisor Ching stated "does this doctor know what the Hell he's doing?" (Ex P p193 lines 20-23) Supervisor Ching also suggested that Plaintiff get a wooden leg, asked her "can't you walk without those crutches?", he asked her "can't you use a cane?" to which Plaintiff replied that she could not put weight on her right heel which was why she needed the crutches." (Ex P p194 lines 3-14)

Plaintiff's medical records further support her claims that she was physically disabled: General Practitioner Michael J. Inada, M.D. from January 1, 1988 to July 30, 3005 (ex E), Podiatrist Michael K.Y. Chun, M.D. who treated Plaintiff's foot problem from December 24, 1999 to March 19, 2001 (ex G), Mark H. Bernstein, M.D. Psychiatrist who treated Plaintiff's anxiety and depression from January 1, 1994 to present (ex R), Todd K. Haruki, M.D. D.D.S. who treated Plaintiff from December 9, 2002 to December 16, 2002 (ex S), Hugh N. Hazenfield, M.D. who treated Plaintiff from May 30, 1997 to present (ex T), Portner Orthopedic

20

Rehabilitation who treated Plaintiff's foot problem from March 10, 2001 to June 30, 2002 (ex II), Marty & Charlie Relief who treated Plaintiff's foot problem from October 22, 2002 to January 17, 2003 (ex JJ), Hawaii Endontics, Inc. Dr. Terry S. Matsumoto D.M.D. who treated Plaintiff from May 29, 1997 to October 4, 2002 (ex KK), Rama Kosuri, M.D. who treated Plaintiff's foot problem from March 10, 2001 to June 30, 2002 (ex HH), Robert Dave, M.D. who treated Plaintiff from February 14, 2003 to July 9, 2003 (ex LL), Douglas P. Hagen, D.O. who treated Plaintiff foot problem from October 30, 2000 to November 30, 2001 (ex DD).

Plaintiff's physical disabilities substantially limited her major life activities of: 1) walking, and 2) working. The term "substantially limits" means that: 1) a person is unable to perform a major life activity that the average person in the general population could perform, or 2) that a person is significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 CFR s1630.2(i) and (j). In this case, it is undisputed that Plaintiff was disabled from walking without two crutches which affected her ability to perform all of her job duties at work from December 1999 through her retirement on October 1, 2001.

Plaintiff was unable to perform the following job duties that were part of her job description: 1) the monthly physical inventory; and 2) climbing ladders to check property on upper levels. (Decla Pl)  These duties would take approximately 3-4 hours one time per month to perform. (Decla Pl)  These duties would be rotated amongst the warehousemen including Gary

Fountain and Clarence Yadao to be performed on Plaintiff's behalf due to her physical disability - walking with 2 crutches. (Decla Pl)

### b) Plaintiff had a record of impairment

Defendant possessed a record of Plaintiff's impairment. "A person has a record of an impairment if that person 'has a history of ... a mental or physical impairment that substantially limits one or more major life activities.'" 237 F.3d at 1089; 29 CFR s1630.2(k) (2000); *Burch v. Coca-Cola Co.,* 119 F.3d 305, 321 (5th Cir. 1997). The many physicians notes and various letters in the record (ex E,G,R,S,T,DD,HH,II,JJ,KK,LL), combined with Plaintiff's prolonged leave requests (ex MM; Decla Pl) create at least a genuine issue of fact regarding a record of Plaintiff's impairments. 237 F.3d at 1089; *Pritchard,* 92 F.3d at 1134 (paid and unpaid disability leave establish evidence of a record of being impaired). The evidence shows that Plaintiff has established a genuine issue of material fact that she has a record of disability and thus is considered disabled under the Rehabilitation Act.

### c) Plaintiff was regarded as having physical disabilities

Plaintiff was regarded as having physical disabilities. Supervisor Ching, Plaintiff's immediate supervisor, testified that he was aware of Plaintiff's disabilities, which included migraines since the 1990's (ex P, p89 lines 1-2), foot pain since 1999 (ex P, p89 lines 3-11, 23-25), foot "frayed tendons in her arch" since 1999 (ex P, p90 lines 1-5), foot "inflammation" (ex P, p 90 lines 13-18), in January 2000 Plaintiff was out of work for the entire month due to foot problems (ex P, p90 lines 21-24), that she needed her foot to be elevated per her doctor's orders (ex P, p91 lines 1-2), that she provided a doctor's statement (ex P, p91 line 2), that she was told by her

22

doctor to keep all weight off her foot (ex P, p91 lines 3-4), that she took "medication" (ex P, p91 lines 8-9; p100 lines 16-20), that as of December 1999 she began walking with the aid of crutches (ex P, p91 lines 12-15), that she continued walking with crutches from December 1999 throughout the year 2000 (ex P p93 lines 2-3), that her doctor requested that she be placed on "light duty" (ex P p97 lines 16-17), that he may have asked her "when do you anticipate permanent recovery" and "when do you anticipate recovery" (ex P p98 lines 7-13), that she did say to Supervisor Ching that her doctors could not predict when she would have a full recovery (ex P p99 lines 9-14), Supervisor Ching never felt that she may not have needed the crutches to walk (ex P p99 lines 22-24), Supervisor Ching never felt that she was faking (ex P p99 line 25 to p100 line 2), that Supervisor Ching said to Plaintiff "I think you should just cut your leg off already" "a dozen or two dozen times" (ex P p104 line 24 to p105 line 1; p105 lines 16-18; p107 lines 9-10), Supervisor Ching admitted that it was inappropriate for him to state "I think you should just cut your leg off already 12-24 times at work (ex P p107 lines 6-8), that his boss Deputy Lilinoe Miyamoto would ask him questions about Plaintiff's foot problems (ex P p107 line 18 to p108 line 9), that his boss Chief Dondoma asked Supervisor Ching how long Plaintiff would be on crutches once or twice (ex P p110 lines 14-16, lines 17-20), that his boss Deputy Lininoe Miyamoto also asked Supervisor Ching how long Plaintiff would be on the crutches approximately two times (ex P p110 lines 21-25), Supervisor Ching related his boss' questions to Plaintiff (ex P p111 lines 1-8), that Plaintiff received cortisone shot treatments which were not helping (ex P p111 lines 9-13), that Plaintiff was going to follow-up visits to doctors (ex P p111 lines 14-16), Supervisor Ching admitted that she should try a different doctor (ex P p111 line 17 to p112 line 3; p112 lines

23

15-19), that Supervisor Ching said "does this doctor know what the Hell he's doing?" (ex P p112 lines 20-25), that Plaintiff should cut her leg off and replace it with a wooden leg (ex P p113 lines 4-13), Supervisor Ching asked Plaintiff "can't you walk without those crutches?" (ex P p113 lines 14-22).

Supervisor Ching also stated to EEO Counselor Charlene E. Lee "[t]he first line supervisor indicated that he approved the complainant leave, because he knew she had a physical injury and she suffered from migraines." (Ex AA, p2)

Supervisor Ching also issued a memorandum dated May 25, 2001 wherein he acknowledged Plaintiff's "migraine headache and a foot problem and has been on crutches for over a year and a half" which he described as "chronic medical conditions." (Ex OO)

In light of all the above, Defendant regarded Plaintiff as disabled from walking and performing all of her work duties from December 1999 through her retirement on October 1, 2001 -- almost two years.

## 2.    Plaintiff was qualified to perform her job

The second element of Plaintiff's prima facie case is that she was qualified to perform her job. It is undisputed that Plaintiff was qualified to perform her job. Supervisor Ching testified that he rated Plaintiff "fully successful" on her annual performance reviews which was the highest rating employees could receive (ex P, p88 lines 8-17; ex P p128 lines 10-12), and in 34 years she was never disciplined for any form of wrongdoing. (Decla Pl; ex P, p87 lines 16-22)  Plaintiff was promoted from GS-4 to GS-5, then GS-6, then GS-7, she received awards such as Sustained Superior Performance Awards, Commendable Service Awards, Within Grade

Increases, and received Joint Meritorious Certificates and Commendable
Service Certificates.  (Ex P p174 line 1 to p175 line 1; Decla Pl)

### 3.    Plaintiff suffered an adverse action because of her disability

The third element of Plaintiff's prima facie case is that she suffered
an adverse action because of her disability.  Plaintiff alleges that the
following constituted adverse actions taken by Defendant against her:

1)    a Letter of Requirement was issued to Plaintiff (ex M; Decla
Pl);

2)    Supervisor Ching admitted that another employee who had a
zero leave balance was not issued a Letter of Requirement as
Plaintiff was (Ex P p129 lines 17-22);

3)    Supervisor Ching testified that no other employee was issued a
Letter of Requirement (ex P p139 lines 3-13);

4)    Supervisor Ching previously approved all of Plaintiff's leave
requests without ever mentioning to her that she should not be
taking her earned accrued leave and in fact testified that her
leave requests were "legitimate" ex P p127, lines 14 to 15);

5)    the Letter of Requirement states that Plaintiff's leave usage
was "excessive," however, Plaintiff's annual leave and sick
leave use actually lessened dramatically from the previous
years (2000, 1999, 1998) (Ex N);

6)    the collective bargaining agreement ("CBA") requires that
Plaintiff produce a medical certificate after three days of leave
(ex P p127, lines 12 to 18), while the Letter of Requirement

Plaintiff to submit a medical certificate for "each sick leave absence.";

7)    the Letter of Requirement required that "routine medical appointments must be made in advance of your absence and will require medical certification" despite the CBA requirement of a medical certificate only after three days of leave taken;

8)    failure to follow the Letter of Requirement would place her on "AWOL status and could result in appropriate disciplinary action"; (Ex M)

9)    the Letter of Requirement states "[a] notation of this action will be posted as an attachment to your SF 7-B card. At the end of three months from the date of issue, your leave record, and the elements of this letter will be reviewed by me. I will advise you if the requirements of this letter are to be continued or canceled." which meant that the Letter of Requirement could go on indefinitely; (Ex M)

10)    Plaintiff was subjected to ridicule and humiliation in the workplace by Supervisor Ching who harassed her in front of her co-workers: "just cut your leg off already" "get a wooden leg" "use a cane" etc.; and

10)    Plaintiff was constructively retired on October 1, 2001. (Ex V; Decla Pl)

### 4.    Defendant's explanation is pretext for disability discrimination

"Under the ADA when an employee establishes a prima facie case of discrimination because of a disability, and the employer provides a non-discriminatory reason for that discharge which 'disclaims any reliance

on the employee's disability in having taken the employment action,' the analysis developed in *McDonnell Douglas* for suits under Title VII of the Civil Rights Act of 1964 applies." *Snead* 237 F.3d at 1093; *Mustafa v. Clark County Sch. Dist,* 157 F.3d 1169, 1175-76 (9th Cir. 1998); *Teahan v. Metro-North Commuter R.R. Co.,* 951 F.2d 511, 514-16 (2d Cir. 1991).

Here, Defendant's Agent Supervisor Ching testified that he issued Plaintiff the Letter of Requirement because her leave balance was zero. (Ex P p125 lines 4-13). "Therefore, on summary judgment, we must determine whether [Plaintiff] provided sufficient evidence to support of a finding of pretext. In so doing, the plaintiff retains the burden of persuasion." 237 F.3d at 1093. "In other words, she now ... ha[s] the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 237 F.3d at 1093-94; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas,* 411 U.S. at 804-05, 93 S.Ct. 1817).

The law also allows a Court to consider the evidence produced as part of a plaintiff's prima facie case to establish pretext. Therefore, in light of all of the above, Plaintiff satisfies a prima facie case of disability discrimination under the disparate treatment theory.

## C.   DEFENDANT VIOLATED THE REHABILITATION ACT UNDER THE "HOSTILE WORK ENVIRONMENT" LEGAL THEORY

27

To prevail on a hostile workplace claim premised on disability discrimination, Plaintiff must show: 1) that she was subjected to verbal or physical conduct of a disability nature; 2) that the conduct was unwelcome; and 3) that the conduct was sufficiently severe or pervasive to alter the condition of the plaintiff's employment and create an abusive work environment. *Gregory v. Widnall*, 153 F.3d 1071, 1074 (1998); *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). "The more outrageous the conduct, the less frequent must it occur to make a workplace hostile." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)

In this case, Supervisor Ching testified that he told his subordinate Plaintiff 12-24 times to "just cut your leg off already" while they were at work, on duty, and being paid by the Federal government, because he noticed that she was walking with the aid of crutches from December 1999 through October 1, 2001. Plaintiff testified as detailed above that Supervisor Ching harassed her in the workplace daily with "just cut your leg off already" "get a wooden leg" "do you really need those crutches" "can't you use a cane?" and many other degrading remarks in the presence of her co-workers in the morning meetings. Plaintiff's co-workers Carol Ah Hee, Gary Fountain, Ed Cubarubbias, and Shizui Yanagi testified in the MSPB hearing (see p9 above) that they also heard the harassment of Plaintiff in the workplace. Supervisor Ching's conduct was outrageous and sufficient enough to make Plaintiff's workplace sufficiently hostile that her treating psychologist recommended that she take an early retirement to escape the workplace harassment. (Ex R) The workplace harassment resulted in Plaintiff's constructive discharge/retirement.

## D.    NO REASONABLE ACCOMMODATION CLAIM

Defendant's arguments are moot (Def's msj p5-7), no such claim.

28

## VI.   FAMILY MEDICAL LEAVE ACT CLAIM

Defendant alleges that Plaintiff did not have a serious medical condition. (Def msj p15)  Plaintiff's medical condition resulted in migraine headaches and her walking with the aid of crutches from December 1999 to the present, and to suffer extreme pain which required her at times to crawl on all fours just to get herself to the bathroom.  (Ex P p179 lines 15-19)  It is undisputed that Defendant was aware of her migraines and need for crutches to walk.  Supervisor Ching admitted that Plaintiff informed him that her father was dying of cancer and that she was the only family member that could care for him.  (Ex P p143 lines 9-21)  Plaintiff was not aware of the FMLA, or that she qualified for FMLA leave, and therefore did not ask for it.  (Decla Pl)  Defendant was responsible for notifying Plaintiff that she qualified for FMLA leave and how to apply for it.  Supervisor Ching admitted that he never informed Plaintiff of her right to FMLA leave.  (Ex P p143 lines 9-21)

Plaintiff was harmed in that: 1) she would have chosen to take the leave as unpaid FMLA leave instead of paid annual leave; and 2) if Defendant had credited Plaintiff with unpaid FMLA leave it would not have issued her the Letter of Requirement.

## VII.   CONCLUSION

In light of the above, Defendant's motion should be denied and this case should proceed to trial.

DATED:    Honolulu, Hawaii, February 21, 2006.

_____
VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
LINDA D. SEKIYA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing

document was or will be duly served upon the following counsel at their last known

address via hand delivery or U.S. Mail, postage pre-paid, as follows:

TO:    THOMAS A. HELPER, ESQ.
       U.S. Attorney's Office
       PJKK Federal Building, Room 6-100
       300 Ala Moana Boulevard
       Honolulu, Hawaii 96850

       Attorney for Defendant
       DONALD H. RUMSFELD,
       officially as secretary of Defense

DATED:    Honolulu, Hawaii, February 21, 2006.

                                    VENETIA K. CARPENTER-ASUI
                                    Attorney for Plaintiff
                                    LINDA D. SEKIYA