VENETIA K. CARPENTER-ASUI
A Law Corporation

VENETIA K. CARPENTER-ASUI    6901
Haseko Center
820 Mililani Street, Suite 812
Honolulu, Hawaii 96813
Telephone:  (808) 523-6446
Facsimile    (808) 523-6727

Attorney for Plaintiff
LINDA D. SEKIYA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LINDA D. SEKIYA, | ) | Civ No. 04-00297 DAE/KSC |
| | ) | |
| Plaintiff, | ) | DECLARATION OF |
| | ) | LINDA D. SEKIYA |
| vs. | ) | |
| | ) | |
| DONALD H. RUMSFELD, | ) | |
| officially as secretary of Defense | ) | |
| | ) | |
| Agency. | ) | |
| | ) | |

## DECLARATION OF LINDA D. SEKIYA

I, LINDA D. SEKIYA, state that:

1. I am the Plaintiff in the above-referenced case.

2. I make this statement based upon my personal knowledge and information, and submit the same in support of Plaintiff's Memorandum In Opposition to the Defendant's motion for summary judgment.

3. On or about July 1975, I was hired by Defense Reutilization & Marketing Office-Hawaii (DRMO-HI), Defense Logistics Agency (DLA), United States Department of Defense (DOD) as a Property Disposal Technician, GS-1107-07.

3. My job description did not include driving a forklift.

4. Throughout my employment, I had no disciplinary actions.

5. I received successful to superior performance ratings during my employment.

6. I received awards during my employment.

7. I had a medical history of migraine/tension headaches (lasting 3-5 days), ulcers, and chronic back pain due to an injury dating back to November 21, 1985. I used accrued leave when my disabilities required time off from work.

8. On or about March 1990, the new DRMO Chief, Mr. Edwin M. Domdoma, arbitrarily lowered approximately a dozen, including my, performance rating. Chief Domdoma had been on-the-job for approximately one (1) month. According to regulation Chief Domdoma was required to be in his position for at least ninety (90) days before making changes to performance ratings. I filed an IG complaint. Chief Domdoma was ordered to reinstate my original ratings. After my complaint, Chief Domdoma retaliated against me. Chief Domdoma stated "I don't like females who stand up to me." This statement was witnessed by my co-workers Carol Ah Hee and Diane Marumoto.

9. On or about December 1999 I began suffering from an additional disability -- "bone spur and chronic right plantar fasciliits" which continues to the present.

10. On or about January 2000, Dr. Michael Chun, a Podiatrist, ordered me to be off my feet for one month. During that time, my supervisor, Mr. Godfrey Ching telephoned me almost daily asking when I was returning to work. I informed him that I was taking painkillers and that I would return as soon as the doctor cleared me. Supervisor Ching was in possession of medical certificates verifying my medical conditions. Supervisor Ching stated, "just cut your leg off already!"

11. On October 17, 2000 Supervisor Ching approached me and stated, "what's the status of your foot condition? It seems like you've been on light duty for a long time. They (co-workers) might think you're getting preferential treatment. When do you anticipate recovery? When do you anticipate permanent recovery?" I replied that he had seen the medical certificates and the doctors cannot make predictions, but the condition appears to be chronic, as I had four different conditions occurring in my right foot (external inflammation, bone spur, plantar faciliitis, plantars warts). Supervisor Ching looked disgusted and walked off.

12. On October 19, 2000 Supervisor Ching stated to me, "your condition has been too long. Do you need the crutches?" I replied, "of course, without it I can't walk. There is no way I can put any pressure on my right foot." Supervisor Ching replied, "seems like they (Chief Domdoma) thinks you're just faking or dragging this on." I replied, "I am taking maximum pain killers (Celebrex 200 mg) twice a day." Supervisor Ching was not interested.

13. On or about November 27, 2000, my father was diagnosed with cancer. He lived independently and I handled his needs and all of his affairs as his only child here in the State of Hawaii. During that time I requested

extra time off to care for my dying father. I informed Supervisor Ching that I was caring for a terminally ill parent, he signed my leave request forms, and he did not inform me about my rights under the Family Medical Leave Act. I used my annual sick leave to care for my terminally ill father. On February 11, 2001 my father was placed in Hospice and on March 23, 2001 he passed away.

14. On or about December 5, 2000, Supervisor Ching asked me for a medical certificate stating how long I would be on crutches. I replied, "I have an appointment for a bone scan." Supervisor Ching again stated, "just cut your leg off already."

15. On December 7, 2000, I overheard Deputy Lilinoe Miyamoto in Supervisor Ching's office asking what the results of the "bone scan" were. Supervisor Ching stated that there was no indication yet and he would see the report later.

16. On December 7, 2000, Supervisor Ching stated to me, "if the doctor sees no sign of improvement you should consider medical retirement." Supervisor Ching began reciting retirement formulas to encourage me to retire. I informed Supervisor Ching that I was not interested in retirement and that I could still perform her job.

17. On December 8, 2000, Supervisor Ching once again informed me that I should consider medical retirement.

18. On December 13, 2000, Supervisor Ching told me that he telephoned my home because I was not at work. I explained that I had 2 hours to call in after the start of my shift and that I was on my way in to work in heavy traffic. Supervisor Ching again asked me for medical records and asked "can't your doctor say how long you will be on crutches? Chief

Domdoma wants to know." I explained that the doctor could not predict that and I had just received a cortisone shot which has not helped me. I explained that I was going for a follow up visit. Supervisor Ching replied in a sarcastic tone, "does this doctor know what the Hell he's doing? Ah, just cut your leg off already! Can't you walk without the crutches? Can't you use a cane?"

19. On February 11, 2000, my father was admitted to a hospice care facility.

20. On March 23, 2001, my father passed away. I was summoned to the hospice care facility at 3:00 a.m. and my father died shortly after my arrival. I took off from work in order to see to the funeral arrangements.

21. On March 26, 2001, I returned to work. Supervisor Ching immediately accosted me and stated, "I called hospice looking for you on March 23, 2001 to find out if you were coming in to work!" Supervisor Ching demanded medical certification for my absence on March 23, 2001.

22. On March 31, 2001, my father's funeral service took place.

23. On or about July 20, 2001, Supervisor Ching informed me that my request to attend the pre-retirement seminar had not been approved yet, therefore, I would not be able to attend. I requested annual leave for that day and paid for the training with my own money. Supervisor Ching stated, "you either stupid or you're rich. If you have so much money, give it to me and I'll teach you discipline". Chief Domdoma permitted other employees to attend training prior to approval.

24. On or about July 2001, the Agency held the pre-retirement seminar at the work site. The Agency was completely closed for the day. I was denied attendance despite being fifty-four (54) years old with thirty-four (34) years of service. Chief Domdoma did not allow three other employees

from the same branch to attend, who ranged in ages of 55 to 70 years of age with 20 to 30 years of service. Most of the Agency's younger employees were in attendance, while the older employees with the most seniority were barred. Co-worker Miles Saito attended the seminar even though he had attended one before.

    a.    There were empty seats available for me and the other older employees that were paid for but the employees did not show up. Chief Domdoma sat in the seminar but refused to allow me and the other older employees to sit in the empty seats. Chief Domdoma also invited Camp Smith employees to attend the seminar and paid for their attendance.

    b.    I was interested in learning of the changes in the laws, health care, benefits, investments, TSP, and others. The seminar provided necessary pre-retirement planning information that applied to me, yet younger employees not eligible to retire, were permitted to attend in my place. Chief Domdoma claimed that the employees who were not allowed to attend the seminar had attended it in 1997. The 1997 seminar and the Federal Week publications emphasize that employees cannot learn everything in one seminar, and should attend one at mid-career, five years prior to retirement, and just before retiring.

    c.    Three other employees also filed EEO complaints regarding this incident. Mr. Miles Saito was permitted to attend although he had previously attended the seminar on or about 1997, was not planning on retiring, and was not eligible to retire. Chief Domdoma authorized younger employees with less years of service and newly hired employees to attend. The Agency spent exorbitant amounts on new office furniture, palm pilots,

color printers, computers, travel, and training, but refused to approve $35.00 for each older employee to attend the retirement seminar.

25. Although I requested a reason for the Agency's refusal to allow me to attend the pre-retirement seminar in writing, I never received it. Three weeks later, in August 2001, I was retaliated against when Supervisor Ching, acting upon instruction of Chief Domdoma, served me with a "Letter of Requirement" alleging leave abuse. The Letter of Requirement required me to produce a medical certificate for each sick leave, even if only one hour. When Supervisor Ching summoned me into his office, I asked him if it would take long and he replied, "no, but you might SHIT when you see this!"

26. I asked for evidence of leave abuse that led to the "Letter of Requirement" but received nothing. The Letter of Requirement stated that my leave for 2001 was "excessive." I used less leave in 2001 than in the past and my Leave and Earnings Statements verify this. My leave requests were approved and there were legitimate reasons for being out of work such my disabilities and the care of my terminally ill father.

|              | 1998 | 1999 | 2000 | 2001 |
|--------------|------|------|------|------|
| Annual Leave | 234  | 226  | 252  | 145  |
| Sick Leave   | 64   | 98   | 106  | 56   |
| LWOP         | 0    | 0    | 0    | 36   |

27. From August through September 2001 I was out of work on leave without pay ("LWOP") instead of the Family Medical Leave Act, as I was entitled to.

28. I was unaware of the fact that I had exceeded my sick leave allowance.

29. From January 2000 through October 2001, on a weekly basis, Supervisor Ching would humiliate me by stating: "just cut your leg off already!" Supervisor Ching would also make this statement in the presence of my co-workers in the morning meetings. This statement was witnessed by my co-workers:

    a. Carol Ah Hee,
    b. Clarence Yadao,
    c. Gary Fountain,
    d. Shizuo Yanagi,
    e. Ed Cubarubbias, and
    f. John Shirai.

30. The turnover rate was extremely high for an Agency consisting of fifty (50) employees. During the previous twelve (12) years, since Chief Domdoma arrived, approximately forty (40) employees left work. Threats such as: "your job is on the line" and "if you don't like it there's the door" were very common. Chief Domdoma stated he had an "open door" policy. However, after meeting with him employees were targeted for retaliation and forced to resign or retire.

31. Due to Chief Domdoma and Supervisor Ching's actions, on or about August 2001, my psychiatrist increased my tranquilizer dosage due to work related stress, anxiety, and insomnia. Despite taking anti-depressants and receiving supportive counseling, the intolerable work conditions made it impossible for me to cope with the hostile working environment. The intensity of her migraine and tension headaches was unbearable and I suffered a relapse of depression.

32. On or about September 2001, my psychiatrist advised me not return to work.

33. Supervisor Ching constantly asked me for medical certificates despite my telephoning in daily. Finally, I asked him, "what's your greatest concern?" to which he replied, "I don't know!"

34. I wrote letters of complaint to Congressman Neil Abercrombie, Vice Admiral Keith W. Lippert, Colonel John A. Marx, Honorable Elxis M. Herman, and Office of Communications and Legislative Affairs.

35. Due to the retaliation, discrimination, hostile work environment, and her doctor's advice, I retired in October 2001, instead of my planned retirement date of October 2004.

36. On or about October 2001, I applied for unemployment compensation. Chief Domdoma and Supervisor Ching opposed my claim. After an appeal, unemployment benefits were granted to me.

37. On November 26, 2001 Cheryl Hoyt contacted me regarding filing an EEO complaint.

38. Immediately after I retired involuntarily, in December 2002, Mr. Ron Camara informed me that my position was upgraded to GS-9 then GS-11. While I was employed Chief Domdoma refused to upgrade it.

39. I filed an informal EEO complaint on December 9, 2001 alleging and submitting documents supporting claims for: a) age discrimination, b) sex discrimination, c) disability discrimination, d) retaliation, e) Family Medical Leave Act violations ("FMLA"), and f) involuntary retirement. (See: EEO complaints, EEO Investigative report, exhibits submitted in support of EEO complaints.)

40. My EEO claims were dismissed in a Final Order dated August 22, 2003. The Final Order did not provide me with verbal or written "notice" that I had the right to file an appeal to the Merit Systems Protection Board ("MSPB") because I had a "mixed case."

41. I filed a disability discrimination lawsuit in Federal District Court on May 6, 2004, which is ongoing.

42. In mid July 2004, I met William Tagupa, Esq. who informed met that I had a "mixed case" and should have received notice that I had the right to file an appeal to the MSPB. This was the first time I was notified of my right to file an MSPB appeal of the Final Order dismissing my claims dated August 22, 2003. I immediately retained Mr. Tagupa to file an MSPB appeal on my behalf. (See MSPB appeal filed.)

43. I was not notified of the time limits and was not otherwise aware of them.

44. Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Personnel Action form dated July 11, 1975.

45. Attached hereto as Exhibit B is a true and correct copy of Plaintiff's employee record.

46. Attached hereto as Exhibit C is a true and correct copy of Plaintiff's performance evaluations for January 1, 1999 to March 31, 1999, January 1, 1999 to December 31, 1999.

47. Attached hereto as Exhibit D is a true and correct copy of Plaintiff's education, training, and award background.

48. Attached hereto as Exhibit E is a true and correct copy of a letter from Plaintiff's Doctor, Dr. Inada dated July 26, 2001.

49. Attached hereto as Exhibit F is a true and correct copy of Plaintiff's I.G. complaint dated May 14, 1990.

50. Attached hereto as Exhibit G is a true and correct copy of Plaintiff's medical records from Dr. Michael K.Y. Chun.

51. Attached hereto as Exhibit H is a true and correct copy of Plaintiff's handwritten notes on incidents occurring from January 2000 to October 2000.

52. Attached hereto as Exhibit I is a true and correct copy of Plaintiff's handwritten notes on incidents occurring from June 2001 to August 2001.

53. Attached hereto as Exhibit J is true and correct copy of an e-mail from Veronica Matsuura-Oneha announcing the Pre-retirement seminar, dated June 4, 2001.

54. Attached hereto as Exhibit K is a true and correct copy of an e-mail from Plaintiff to Godfrey Ching regarding Plaintiff's request to attend the seminar, dated June 5, 2001.

55. Attached hereto as Exhibit L is true and correct copy of a letter from Plaintiff requesting a reason for her being denied attendance to the seminar, dated July 27, 2001.

56. Attached hereto as Exhibit M is a true and correct copy of Plaintiff's Letter of Requirement dated August 22, 2001.

57. Attached hereto as Exhibit N is a true and correct copies of Plaintiff's Leave and Earnings Statements.

58. Attached hereto as Exhibit O is a true and correct copy of Caroleen Ah Hee's declaration dated August 1, 2003.

59. Attached hereto as Exhibit Q is a true and correct copy of Plaintiff's handwritten notes on the number of employees that have left the DRMO.

60. Attached hereto as Exhibit R is a true and correct copy of Plaintiff's medical record from Dr. Bernstein.

61. Attached hereto as Exhibit S is a true and correct copy of Plaintiff's medical record from Dr. Todd K. Haruki, M.D., D.D.S.

62. Attached hereto as Exhibit T is a true and correct copy of Plaintiff's medical record from Dr. Hugh N. Hazenfield, M.D. F.A.C.S.

63. Attached hereto as Exhibit U is a true and correct copy of Plaintiff's letter to Honorable Neil Abercrombie dated September 25, 2001.

64. Attached hereto as Exhibit V is a true and correct copy of Plaintiff's Personnel Action Form dated October 1, 2001.

65. Attached hereto as Exhibit W is a true and correct copy of Plaintiff's application for unemployment insurance dated October 17, 2001.

66. Attached hereto as Exhibit X is a true and correct copy of SOH, Unemployment Insurance Division's Summary of Fact Finding Interview dated November 8, 2001.

67. Attached hereto as Exhibit Y is a true and correct copy of Plaintiff's unemployment insurance appeal.

68. Attached hereto as Exhibit Z is a true and correct copy of Plaintiff's handwritten note dated December 26, 2002.

69. Attached hereto as Exhibit AA is a true and correct copy of Plaintiff's EEO Counselor's Report dated April 23, 2002.

70. Attached hereto as Exhibit BB is a true and correct copy of Plaintiff's Informal EEO- Intake information dated December 9, 2001.

71. Attached hereto as Exhibit CC is a true and correct copy of Plaintiff's Formal EEO Complaint, dated January 24, 2002.

72. Attached hereto as Exhibit DD is a true and correct copy of the Plaintiff's medical record from Douglas P. Hagen, D.O.

73. Attached hereto as Exhibit EE is a true and correct copy of Plaintiff's Federal Discrimination Complaint dated May 6, 2004.

74. Attached hereto as Exhibit FF is a true and correct copy of a letter from the U.S. Department of Labor to Plaintiff dated November 5, 2001.

75. Attached hereto as Exhibit GG is a true and correct copy of the negotiated agreement between Defense Property Disposal Office and Service Employees International Union effective date July 28, 1981.

76. Attached hereto as Exhibit HH is a true and correct copy of Dr. Kosuri's medical note on Plaintiff's condition.

77. Attached hereto as Exhibit II is a true and correct copy of Plaintiff's medical record from Portner Orthopedic Rehabilitation.

78. Attached hereto as Exhibit JJ is a true and correct copy of Plaintiff's medical record from Marty & Charley.

79. Attached hereto as Exhibit KK is a true and correct copy of Plaintiff's medical record from Hawaii Endodontics, Inc.

80. Attached hereto as Exhibit LL is a true and correct copy of Plaintiff's medical record from Dr. Robert Dave.

81. Attached hereto as Exhibit MM is a true and correct copy of Leave of absence forms.

82. Attached here to as Exhibit NN is a true and correct copy of Plaintiff's job description.

83. Attached here to as Exhibit OO is a true and correct copy of Memorandum for Record.

84. I was not aware of the FMLA, or that I qualified for FMLA leave, and therefore did not ask for it.

85. I never filed an EEO complaint in the 34 years that I was employed by the Federal government and did not know of any individual who had.

86. I did not have an attorney and was trying to obtain information on how to go about filing a complaint on my own by writing to five (5) persons/entities.

87. Defendant presented no evidence that I was ever notified about the EEO, what the time limits were, or how to go about determining whether my facts were such that should be filing with the EEO until I received a letter dated November 5, 2001.

88. I would not have wasted so much time writing to the five (5) persons/entities and waiting for their responses, if I knew where to go for help.

89. I did not even belong to union the I could have gone to for help.

90. As of the MSPB hearing date Monday, December 6, 2004, I still soak my feet every night and still slept with a night splint on my right foot and walked with at least one crutch for support.

91. I was unable to perform the following job duties that were part of my job description: 1) the monthly physical inventory; and 2) climbing ladders to check property on upper levels. These duties would take approximately 3-4 hours one time per month to perform. Theses duties would be rotated amongst the warehousemen including Gary Fountain and Clarence

Yadao to be performed on my behalf due to my physical disability - walking with 2 crutches.

  92. Supervisor Chang told me the reason for my "Letter of Requirement" was due to low leave hours.

  93. My use of crutches from December 1999 through my retirement on October 1, 2001, to the present, prevented me from performing all of my job duties.

  94. My sick leave in January 2000 for the entire month due to my foot problems, resulted in my use of sick leave.

  95. My migraines in 2000 and 2001, 1-2 times per month affected my ability to appear for work, resulting in my use of sick leave.

I, LINDA D. SEKIYA, do declare under penalty of law that the foregoing is true and correct.

Dated:    Honolulu, Hawaii, February 21, 2006.

*[signature]*
LINDA D. SEKIYA