

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE


LINDA D. SEKIYA            )
              Appellant,  )
                          )
v.                        )      Case No. SF-0752-04-0758-I-1
                          )
                          )
DEPARTMENT OF DEFENSEE,    )
              Agency.)
                          )
                          )


CAROL J. TEATHER
Administrative Judge


MONDAY, DECEMBER 6, 2004
10:00 A.M.


Reported by:  Kevin Green
              rll

EXHIBIT P

9

1    A.   Yes.

2    Q.   Did you ever hear her supervisor, Godfrey Ching

3  comment about Ms. Sekiya's absences from work?

4    A.   Not -- not really.

5    Q.   What does that mean?

6    A.   You mean, the long periods, you mean?

7    Q.   Would he make any comment about Ms. Sekiya being

8  absent from work ever?

9    A.   I don't remember.

10    Q.   He may have made comments?

11    A.   He may have.

12    Q.   Did you ever hear Supervisor Godfrey Ching make

13  comments about Ms. Sekiya use of crutches?

14    A.   Yes.

15    Q.   What did he say about that?  And would you speak up

16  for the Judge, please.

17    A.   There was one occasion, like, when we were eating

18  lunch in the multi-purpose room and it was just Custie and I,

19  and he came in and he -- he said some kind of remark, "Go cut

20  off your leg already, just cut off your leg already."

21    Q.   Now, you heard that clearly?

22    A.   Yes.

23    Q.   Did you ever hear Ms. Sekiya say, "I should cut my leg

24  off or have my leg amputated?"

25    A.   No.

10

1    Q.    Okay.  Did you ever hear Mr. Ching say anything else

2  about Ms. Sekiya's use of crutches?

3    A.    There was another occasion but it was outside of the

4  lunch room and there were other people, and I can't really

5  recall who, but he just made a joke about cut off your leg

6  already.

7    Q.    So you heard him say that on two occasions?

8    A.    Yes.

9    Q.    And what was Ms. Sekiya's reaction to Supervisor Ching

10  saying, "Cut your leg off already?"

11    A.    Well, the first one in the lunch room, I know Donna,

12  she -- she didn't look too happy, but she didn't say anything

13  but she didn't look happy.  But the one outside where there

14  were other people in her office, it didn't seem to bother

15  anybody.  It was more like a joke, but there were other people

16  around and maybe that didn't seem right.

17    Q.    Did she seem embarrassed in your opinion?

18    A.    I don't even recall.  I don't remember.

19    Q.    Do you remember how many other people were around when

20  he said that a second time outside of the lunchroom?

21    A.    I can only remember one other person and I -- I think

22  it was one of the warehouse workers.

23    Q.    Do you remember who that was?

24    A.    I think it may have been Miles Saito.

25    Q.    Did you ever hear Supervisor Ching say that Ms. Sekiya

18

 1  section in Building 141 where the PMB office was where Ms.

 2  Sekiya worked?

 3      A.   Yes.

 4      Q.   Okay.  How often would you go over there?

 5      A.   Maybe three times, four times a week because I have to

 6  go over there to check the equipment out.

 7      Q.   Okay.  And you had lunch with Ms. Sekiya, right?

 8      A.   Yes.

 9      Q.   Um-hum.  You mentioned that you heard her supervisor,

10  Godfrey Ching twice make a comment to her about cutting off her

11  leg.  In what manner did he say it?

12          MS. CARPENTER-ASUI:  Objection.  Vague as to manner.

13          MS. CHEN:  From what you observed.

14          ADMINISTRATIVE JUDGE TEATHER:  The appellant -- I

15  mean, the witness can answer if she can.

16          THE WITNESS:  On the two occasions you're talking

17  about?

18  BY MS. CHEN:

19      Q.   Um-hum.

20      A.   Well, the first time -- the first time was in the

21  lunch room with just she and I.  And I -- I can't remember what

22  -- why he said it, but he said, "Just cut off your leg

23  already," and you know, I look at Custie and she didn't say

24  anything but she didn't look happy.  And the second incident,

25  which was outside with -- with some witnesses was in a joking

19

1   manner, "Just cut off your leg already."

2     Q.   Did he laugh?

3     A.   Yes.

4     Q.   He laughed when he said it?

5     A.   Yes.

6     Q.   Um—hum.  I believe he said that she didn't look -- was

7   it -- never mind.  On either occasion, did Ms. Sekiya say

8   anything to him in response?

9     A.   No, she did not.

10    Q.   Did you ever hear her tell him that she didn't like

11  that comment?

12    A.   No, I don't -- no.

13    Q.   From what you observed, did you think he was trying to

14  get her upset by saying that?

15      MS. CARPENTER-ASUI:  Objection.  Calls for

16  speculation.

17      MS. CHEN:  From what she observed.

18      ADMINISTRATIVE JUDGE TEATHER:  Overruled.

19  BY MS. CHEN:

20    Q.   From what you observed, did you think Godfrey was

21  trying to get her upset by saying that?

22    A.   I don't know what he was trying to get at.

23    Q.   When did you become a management assistant instead of

24  a property disposal technician?

25    A.   When I moved up to Camp Smith

25

1  could -- who knew -- who knew him and they would just shrug it

2  off and some who would -- who didn't like the way he said

3  things.

4      Q.   Do you think those comments were appropriate for a

5  supervisor in the work place to subordinates?

6      A.   No, I don't think so.

7      Q.   Do you think it was appropriate for Chief -- I'm

8  sorry, Supervisor Ching to say, "Just cut your leg off already"

9  to Ms. Sekiya?

10     A.   No, that wasn't right.

11     Q.   And when you said he was joking, did you think it was

12  appropriate for him to joke about cutting her leg off?

13     A.   No.

14     Q.   And do you think it was okay because he -- he laughed

15  about it?

16     A.   No.

17     Q.   You also wrote on No. 8 that you were afraid that he

18  would retaliate against you.

19     A.   Yes.

20     Q.   You were fearful.  Why did you say you were fearful of

21  retaliation?

22          MS. CHEN:  Objection, Your Honor.  She's switching now

23  from --

24          ADMINISTRATIVE JUDGE TEATHER:  Overruled.

25          MS. CHEN:  -- Mr. Ching to Mr. Domdoma.

001506

28

1    A.    No, I did not.

2    Q.    Did you ever observe Godfrey Ching raise his voice to

3 Linda Sekiya?

4    A.    No, I did not.

5    Q.    Was Godfrey Ching in your chain of command?

6    A.    No, he was not.

7         MS. CHEN:  That's all I have.

8         MS. CARPENTER-ASUI:  Just one more question, Your

9 Honor.

                    REDIRECT EXAMINATION

10

11 BY MS. CARPENTER-ASUI:

12    Q.    Number seven says Mr. Godfrey Ching made degrading

13 comments about Ms. Sekiya's foot disability.  Did you consider

14 his comments, cut your foot off already -- cut your leg off

15 already a degrading comment or off the wall comment?

16    A.    Well, the one in the lunch room she didn't look happy,

17 so you know, to me that was degrading.

18         MS. CARPENTER-ASUI:  Nothing further, Your Honor.

                    RECROSS EXAMINATION

19

20 BY MS. CHIN:

21    Q.    That's how you felt.  Is that right about the comment?

22    A.    Yes, that's how I felt.

23    Q.    You don't -- you don't -- from what you observed did

24 you know that -- was it your belief that Godfrey Ching wanted -

25 - intended it to be degrading?

32

1    Q.   Did you ever hear Supervisor Ching about comments

2  about Ms. Sekiya walking with crutches?

3    A.   I don't recall that.

4    Q.   Did you ever hear Supervisor Ching say that Ms. Sekiya

5  should take medical retirement?

6    A.   No, ma'am.

7    Q.   Or regular retirement?

8    A.   Not that I know of.

9    Q.   Did you ever hear Supervisor Ching comment that Ms.

10  Sekiya should just cut her leg off already?

11    A.   Not directly but I have heard of, you know, I heard

12  that from someone else.

13    Q.   From who?

14    A.   I believe it's Gary.

15    Q.   Gary who?

16    A.   A co-worker, Gary.

17    Q.   Fountain?

18    A.   Um-hum.

19    Q.   Okay.  What did he tell you?

20    A.   That Mr. Ching made that remark.

21        MR. BOWMAN:  Objection, Your Honor.  Hearsay.

22        ADMINISTRATIVE JUDGE TEATHER:  Overruled.

23  BY MS. CARPENTER-ASUI:

24    Q.   I'm sorry.  Go ahead and answer.  Mr. Fountain said

25  what?

001513

56

1    A.    If you're talking about like a joke, yes.

2    Q.    What joke?

3    A.    He said like a couple of time he made a comment where

4  she should have her leg cut off because of the problems she had

5  as a joke.

6    Q.    How do you know it was a joke?

7    A.    Well, he meant it as a joke, but it -- he said his

8  jokes sometime come off the wall and, you know, some people

9  when you tell jokes it doesn't feel right, you know.  I mean,

10  I'm a handicap myself and people tell like mean jokes about

11  myself.  So he says a joke or knew when it's a joke.  I think

12  he tells same joke and it may go over your head but as a

13  friend.  And some people tell a same joke and it's not -- he's

14  not a friend and you know it hurts.

15    Q.    Is it appropriate in your opinion for supervisors to

16  make jokes about handicap people?

17    A.    No.

18    Q.    Then where -- can you tell us what happened on these

19  incidents when you said he said a couple of times she should

20  have her leg cut off?  What were the circumstances?

21    A.    Well, just, you know, I mean, we -- one time she was

22  walking and he turned around and told Ms. Sekiya, "Oh, you

23  should have leg cut off already."  You know, just a joke about,

24  like I said, some people make things a joke and some people

25  might not.  I felt it wasn't.

57

1    Q.   Do you know anyone who thinks it is a joke to say,

2  "You should just get your leg cut off already?"

3    A.   I don't know.

4    Q.   And did you see Ms. Sekiya's reaction?

5    A.   Yes, she was disgusted.

6    Q.   How do you know?

7    A.   Her face, looks.

8    Q.   Did you ever hear Ms. Sekiya say, "I should cut my own

9  leg off?"

10    A.   No.

11    Q.   And what was the next -- the other incident?

12    A.   Well, like I say, he said that a couple of times, same

13  joke but --

14    Q.   In the morning?

15    A.   Yeah.

16    Q.   Was that the morning meeting?

17    A.   Some time just prior to the morning meeting as she's

18  walking into the building.

19    Q.   And when he sees her, then he makes a comment?

20    A.   Um-hum.  Yeah.

21    Q.   Did you ever hear Supervisor Ching comment about her

22  walking with crutches?

23    A.   Oh, just that.

24    Q.   Did you ever see -- hear Supervisor Ching say anything

25  about Ms. Sekiya should take early retirement -- oh, medical

70

1    Q.    Do you recall Ms. Sekiya being absent from work for

2    periods of time?

3    A.    Yes.

4    Q.    Did you ever hear Supervisor Ching comment about Ms.

5    Sekiya's absences from work?

6    A.    No, ma'am, I can't -- I cannot recall on that, no.

7    Q.    Did you ever hear Supervisor Ching comment about Ms.

8    Sekiya's walking with crutches?

9    A.    Well, he -- he was kind of joke when he mentioned

10   something.

11   Q.    What did he say?

12   A.    He mentioned something that it could be better to

13   replace with a wooden, you know, leg.  It could, you know, work

14   a little bit better, something like that.  But was it.

15   Q.    And how many times did he say that she should replace

16   her leg with a wooden leg?

17   A.    I can recall only once.

18   Q.    Was this in a morning meeting?

19   A.    No, ma'am, I don't think so.

20   Q.    Was it just in a one-on-one conversation with you?

21   A.    With -- yeah, with me and Ms. Sekiya.

22   Q.    And that was Godfrey Ching?

23   A.    Yes, ma'am.

24   Q.    And did you see Ms. Sekiya's face when Supervisor

25   Ching said that?

001551

71

1    A.   Yes.

2    Q.   What did her face look like?

3    A.   She just kind of smiled and, you know -- you know,

4  smiling and stuff.  I haven't seen any -- or heard what she

5  said, but she was smiling.

6    Q.   Did she say anything?

7    A.   No, I don't hear that.

8    Q.   Did she seem embarrassed?

9    A.   No.

10   Q.   Did you ever say -- hear Ms. Sekiya say that she

11  should cut off her own leg?

12   A.   Did she said?

13   Q.   Yes.  Did you hear her say she should cut off her leg?

14   A.   No.

15   Q.   Or have her leg chopped off?

16   A.   No.

17   Q.   When Ms. Sekiya was absent from work, who performed

18  her duties?

19   A.   As far as I know, I don't think there was any because

20  the desk was always empty when she's not at work.

21   Q.   Did you attend the July 30th, 2001 preretirement

22  seminar?

23   A.   No, ma'am.

24   Q.   Did -- were you approved to attend?

25   A.   I'm not sure because during that time I have scheduled

92

1    A.    I wouldn't recall what the conversation was about.

2    Q.    Do you recall what kind of issues they were at all?

3    No?

4    A.    Just that it was part of the -- the email program

5    which she was in charge of.

6    Q.    How many times do you think you called her at home

7    during that one month, January, '00?

8    A.    Once or twice.

9    Q.    Is it possible that you called her every day?

10    A.    Never.    No.

11    Q.    When you would call her at home, would you ask her

12    about the condition of her -- her -- her foot, her leg?

13    A.    It would be an introductory type of question, how are

14    you, how are you feeling.

15    Q.    Did you ever say specifically how is your foot?

16    A.    I don't recall.

17    Q.    Or how's your leg?

18    A.    I don't recall.

19    Q.    Did you -- in January, 2000, did you ever say to her

20    on the phone, "Just cut your leg off already?"

21    A.    No.

22    Q.    Did you tell her that she was taking too much time, a

23    whole month off for this foot problem?

24    A.    No.

25    Q.    And then she returned to work after January, 2000?

001573

104

1     Q.   And at that point when she told you her father was in

2  Hospice, did you tell her that she was entitled to leave under

3  the Family Medical Leave Act?

4     A.   No.

5     Q.   And then, on or about March 23rd, 2001, did you learn

6  that Ms. Sekiya's father had passed away?

7     A.   No, not on that date.

8     Q.   Do you know the precise date?

9     A.   Well, it was after that date.

10     Q.   Sometime after.  And how did you learn about that?

11     A.   I'm not sure where I heard it from, but I just heard

12  it from the office.

13     Q.   Do you know if you heard it from Ms. Sekiya?

14     A.   No, I don't recall.

15     Q.   You might have heard it from her?

16     A.   I may have.

17     Q.   Do you recall that on or about December 5, 2000 asking

18  Ms. Sekiya for a medical certificate that would state how long

19  she would be using the crutches?

20     A.   No, I don't recall that.

21     Q.   Do you recall Ms. Sekiya telling you that she had an

22  appointment for a bone scan?

23     A.   No.

24     Q.   And, I'm sorry, did you -- did you ever say to Ms.

25  Sekiya, "I think you should just cut your leg off already?"

105

1    A.   Yes.

2    Q.   Okay.  And when did you say this?

3    A.   I think this was maybe five or six months after she

4 started using the crutches and her initially having the foot

5 problem.  I were pretty much joking in office and prior to that

6 she'd said, "I might as well just cut my leg off," and then

7 became like a office joking back and forth.

8    Q.   And do you have any witnesses that heard Ms. Sekiya,

9 "I might as well just cut my leg off?"

10    A.   I don't know.

11    Q.   No one heard that statement?

12    A.   I don't know if anyone else heard it.

13    Q.   You can't tell us anyone else who can say they heard

14 that statement?

15    A.   No.

16    Q.   Do you know how many times you might have said to Ms.

17 Sekiya that she should cut her leg off?

18    A.   Oh, jokingly, maybe a dozen or two dozen times.

19    Q.   And in your opinion, is that an appropriate statement

20 for a supervisor to make to her subordinates?

21    A.   It was always during a context of conversation with

22 her when we would have -- talk about different things and her

23 -- her foot would come up now and then.  It was more of a one

24 on one personal type of a discussion rather than a job related

25 type discussion.

001586

113

1    Q.   And then, did you -- you might have followed that up

2    with, "Oh, just cut your leg off already?"

3    A.   I -- I don't recall saying that right after that.

4    Q.   Mr. Cubarrubias, and I don't know if that's the proper

5    pronunciation, testified that he heard you say that she should

6    cut her leg off and replace it with a wooden leg.  Do you

7    recall --

8    A.   I don't --

9    Q.   -- saying -- test -- did you recall saying that in

10   front of him?

11   A.   No, I don't recall.

12   Q.   You might have?

13   A.   Yeah.

14   Q.   Do you recall asking her, Ms. Sekiya, "Can't you walk

15   without those crutches?"

16        MS. CHEN:  I believe you asked that before.

17        ADMINISTRATIVE JUDGE TEATHER:  Overruled.  He can

18   answer if he recalls.

19        THE WITNESS:  Well, I don't recall.

20   BY MS. CARPENTER-ASUI:

21   Q.   You might have?

22   A.   Yeah.

23   Q.   Did you -- do you recall asking her, "Can't you use a

24   cane?"

25   A.   No, I don't recall that.

190

1    A.    Because I was scheduled for nuclear x-ray to see if

2    there was any fracture or why I wasn't healing properly.

3    Q.    And did he say anything when you told him about the

4    bone scan?

5    A.    He did say make sure that we get the results which

6    they did.

7    Q.    You gave it to them?

8    A.    I had a doctor write it on the certificate what the

9    results of the x-ray was.

10    Q.    And you gave it to Mr. Ching?

11    A.    Godfrey Ching, yes.

12    Q.    Do you know what exhibit tab that is off the top of

13    your head?

14    A.    It might be under Dr. Michael --

15    Q.    That's okay.

16    A.    Dr. Chun.  Dr. Chun.

17    Q.    That was Dr. Chun?

18    A.    Yeah, Dr. Michael Chun.

19    Q.    And you handed it to Supervisor Ching?

20    A.    Yes.

21    Q.    When you were talking to Supervisor Ching about the

22    bone scan, do you recall him saying anything about cutting your

23    leg off?

24    A.    He may have at that point.  I mean, he -- it's been

25    said continuously for a year and nine months, from January 2000

191

1  up until the time I retired.

2      Q.    Would he say it just when the two of you were alone in

3  private or --

4      A.    Most of the time it was, yes.

5      Q.    And did he ever say it in front of your co-workers?

6      A.    Co-workers may have overheard, yes.

7      Q.    Did any of them ever say anything to you when he said

8  that?

9      A.    I'm sorry?

10     Q.    Did any -- did you ever speak to any of your co-

11  workers about that comment, "Just cut your leg off already,"

12  being said?

13     A.    Oh, yeah, yeah.  I -- I -- I felt so humiliated.  It's

14  just a degrading remark and I thought it was so unprofessional

15  coming from a supervisor especially and I really didn't

16  appreciate it, not one bit at all.

17     Q.    You heard Mr. Bowman ask if you stand up for yourself.

18  Did you ever tell Supervisor Ching, you know, "Don't say that

19  to me again," or anything like that?  Did you ever threaten to

20  turn him in or --

21     A.    I told him to shut up a number of times.

22     Q.    Well, how many times did you say shut up?

23     A.    Well --

24     Q.    And was it always in a response to that comment or was

25  it --

001672

251

1    A.    Yes, that's correct.

2    Q.    Did she ever tell you after that that she was taking

3  leave to take care of her father?

4    A.    No.

5    Q.    Did any of her leave slips indicate that she was

6  taking care of her father?

7    A.    No.

8    Q.    After you spoke to her about her -- her absences on

9  May 26, did she continue to take annual and sick leave?

10    A.    Yes, she did.

11    Q.    When you made that comment to her about cutting off

12  her leg in gist, did she ever tell you that she didn't like it?

13    A.    No, she never did.

14    Q.    Did you intend to get her upset by making that

15  comment?

16    A.    No, never.

17    Q.    Did anyone else tell you that she didn't like it?

18    A.    No one did, no.

19    Q.    Would you have said that comment if you knew that it

20  upset her?

21    A.    Oh, definitely not.

22    Q.    Did you nominate Ms. Sekiya for Employee of the

23  Quarter?

24    A.    Yes, I did.

25    Q.    And did you have to write a justification for that?

87

1    Ms. Sekiya at the DLA?

2        A.    Work with her, you mean, I've known her since 1988.

3        Q.    She was already there when you started?

4        A.    Yes.

5        Q.    And you were always her first line supervisor?

6        A.    No.  I was a -- I was just a material storer

7    identifier.

8        Q.    And you were promoted?

9        A.    To a supervisor position, yes?

10       Q.    Yes?

11       A.    That would be in September of 1997.

12       Q.    And was it then that you became Ms. Sekiya's

13   supervisor?

14       A.    No, I was the receiving foreman at that time.

15       Q.    Okay.  When did you become her immediate supervisor?

16       A.    That would be December 21st, 1998.

17       Q.    December 21st, '98.  Now, you were her supervisor from

18   December 21st, '98 through October 1, 2001?

19       A.    Correct.

20       Q.    At any time during that period did Ms. Sekiya receive

21   any disciplinary action?

22       A.    No.

23           ADMINISTRATIVE JUDGE TEATHER:  Excuse me.

24           MS. CARPENTER-ASUI:  And, in fact --

25           ADMINISTRATIVE JUDGE TEATHER:  Did you say -- I didn't

88

1    get the month.  Was that December or September that you became

2    Ms. Sekiya's supervisor?

3                THE WITNESS:  December.

4                ADMINISTRATIVE JUDGE TEATHER:  December.

5                THE WITNESS:  Yes.

6                ADMINISTRATIVE JUDGE TEATHER:  Thank you.

7    BY MS. CARPENTER-ASUI:

8        Q.    And you prepared Ms. Sekiya's performance rating?

9        A.    Yes.

10       Q.    And what kind of ratings did she receive from you?

11       A.    Fully successful.

12       Q.    What does that mean?

13       A.    The performance rating is you can rate the employee

14   one, two, or three, three being the highest fully successful,

15   two being minimally successful, and one being not successful.

16       Q.    And you rated her in the highest category?

17       A.    Yes.

18       Q.    Did Ms. Sekiya receive any awards during her

19   employment under you?

20       A.    Not that I'm aware of.

21       Q.    How about any certificates?

22       A.    I'm -- I don't think so.

23       Q.    How about any letters of appreciation?

24       A.    I don't recall.

25       Q.    Okay.  Do you recall Ms. Sekiya having any kind of a

89

1    medical problem?  Let's -- let's stay in the 1990's.

2        A.    I heard that she had migraines.

3        Q.    Any others you're aware of?

4        A.    In the 1990's, you say?  Late 1999 her foot.

5        Q.    How about chronic back pain?  Did you ever learn of

6    that?

7        A.    No.

8        Q.    How about gastrointestinal problems, ulcers?

9        A.    No.

10       Q.    Okay.  And the foot pain you recall being about '99?

11       A.    Yes.

12       Q.    Do you recall that in 1990 Chief Domdoma was detailed

13   to DLA?

14       A.    I'm not certain of the date, but yes.

15       Q.    Do you recall that when he was detailed to DLA that he

16   had changed some of the ratings for the employees at DLA,

17   lowering their rating from what you supervisors, first line

18   supervisors had rated the employees?

19       A.    No, I'm not aware.

20       Q.    You don't recall that?  Okay.  Did you ever hear Chief

21   Domdoma say, "I don't like females who stand up to me?"

22       A.    No.

23       Q.    Now, you recall about 1999, December Ms. Sekiya

24   started suffering from some kind of foot problem?

25       A.    Yes.

90

1    Q.    Do you know what those were?

2    A.    She told me that it was frayed tendons in her arch.

3    Q.    Frayed tendons in arch?

4    A.    Yes.

5    Q.    Did she say anything else?

6    A.    Not that I recall.

7    Q.    Did she say bone spur?

8    A.    I don't recall that.

9    Q.    Did she say chronic right plantar facilities?

10   A.    She may have but I would have understood that.

11   Q.    Okay.  Did she say plantar's warts?

12   A.    Again, I would have never remembered that.

13   Q.    Did she say anything about inflammation or did you see

14   inflammation?

15   A.    I did not see inflammation, but yes, she did mention

16   inflammation.

17   Q.    Was her foot exposed or did she wear socks?

18   A.    She wore socks and she told me.

19   Q.    Her -- her feet weren't exposed to your view?

20   A.    No.

21   Q.    And do you recall on or about January, 2000 Ms. Sekiya

22   was put out of work for the whole month because of her foot

23   related problems?

24   A.    Yes.

25   Q.    Now, when she was -- what did she tell you about that?

91

1     A.     That she needed her foot to be (indiscernible) per her

2   doctor's orders.   I think she provide a doctor's statement.

3     Q.     Was she told to keep all the weight off that foot?

4     A.     Something of that nature, yes.

5     Q.     Okay.  And did she tell you she was taking pain

6   killers?

7     A.     That part I'm not certain.

8     Q.     Or medication?

9     A.     Medication, yes.

10    Q.     Did she ever seem to be in pain?

11    A.     I don't know.

12    Q.     And when she begin walking with crutches?  Was it on

13  or about December, '99 when she first started complaining about

14  the foot problems, or was it later, or what?

15    A.     Probably December, '99.

16    Q.     And did she walk with one crutch or two crutches?

17    A.     I don't recall whether it was one or two.

18    Q.     Okay.  Okay.  Now, in January, 2000 when she was at

19  home for a month, did you ever call her at home and -- for any

20  reason?

21    A.     Yes, I believe I did.

22    Q.     Why?

23    A.     It was job related type questions on the email

24  program.

25    Q.     Such as?

1   turn in a medical certificate?

2       A.   Not that I recall.

3       Q.   So she complied with the policy?

4       A.   Yes.

5       Q.   And do you know the number for that policy?

6       A.   No, I don't.

7       Q.   Is it in writing or just a verbal thing?

8       A.   It's a -- it's part of the union contract.

9       Q.   Union contract.  Do you remember Ms. Sekiya saying

10  that her doctors could not predict when she would have a full

11  recovery?

12      A.   Do I remember her saying that?

13      Q.   Yes.

14      A.   I believe so, yes.

15      Q.   Do you recall a conversation on or about October 19th,

16  2000 with Ms. Sekiya where you -- you may have said, "Your

17  condition has been too long.  Do you need those crutches?"

18      A.   No, I don't recall.

19      Q.   I should have broken it down.  You don't recall either

20  one of those statements?

21      A.   No.

22      Q.   Did you ever feel that she may have not needed the

23  crutches to walk?

24      A.   No.

25      Q.   Did you ever feel that she was faking, you know,

100

1  faking her -- any of her illnesses?

2     A.   No.  No.

3     Q.   Do you recall Ms. Sekiya saying to you, "Of course I

4  need the crutches.  Without them I can't walk.  There's no way

5  I can put pressure on my right foot?"

6     A.   No.

7     Q.   Do you recall ever saying, "It seems like they, or

8  Chief Domdoma and the higher ups think you're just faking or

9  dragging this on?"

10    A.   No, I don't recall saying that.

11    Q.   Did any of the upper echelon give you the impression

12  they felt she was faking?

13    A.   No.

14    Q.   Or dragging it out longer than necessary?

15    A.   No.

16    Q.   Do you recall Ms. Sekiya telling you that she was

17  taking maximum pain killers of Celebrex 200 milligrams two

18  times a day?

19    A.   I recall her saying that she was taking medication.

20  I'm not sure if she mentioned Celebrex or -- or what.

21    Q.   Do you recall Ms. Sekiya on or about November 27, 2000

22  telling you that her father had been diagnosed with cancer?

23    A.   I recall her telling me that her father was ill.

24    Q.   Do you recall ever learning that her father had

25  cancer?

001581

104

1     Q.    And at that point when she told you her father was in

2   Hospice, did you tell her that she was entitled to leave under

3   the Family Medical Leave Act?

4     A.    No.

5     Q.    And then, on or about March 23rd, 2001, did you learn

6   that Ms. Sekiya's father had passed away?

7     A.    No, not on that date.

8     Q.    Do you know the precise date?

9     A.    Well, it was after that date.

10    Q.    Sometime after.  And how did you learn about that?

11    A.    I'm not sure where I heard it from, but I just heard

12  it from the office.

13    Q.    Do you know if you heard it from Ms. Sekiya?

14    A.    No, I don't recall.

15    Q.    You might have heard it from her?

16    A.    I may have.

17    Q.    Do you recall that on or about December 5, 2000 asking

18  Ms. Sekiya for a medical certificate that would state how long

19  she would be using the crutches?

20    A.    No, I don't recall that.

21    Q.    Do you recall Ms. Sekiya telling you that she had an

22  appointment for a bone scan?

23    A.    No.

24    Q.    And, I'm sorry, did you -- did you ever say to Ms.

25  Sekiya, "I think you should just cut your leg off already?"

105

1    A.    Yes.

2    Q.    Okay.  And when did you say this?

3    A.    I think this was maybe five or six months after she

4    started using the crutches and her initially having the foot

5    problem.  I were pretty much joking in office and prior to that

6    she'd said, "I might as well just cut my leg off," and then

7    became like a office joking back and forth.

8    Q.    And do you have any witnesses that heard Ms. Sekiya,

9    "I might as well just cut my leg off?"

10    A.    I don't know.

11    Q.    No one heard that statement?

12    A.    I don't know if anyone else heard it.

13    Q.    You can't tell us anyone else who can say they heard

14    that statement?

15    A.    No.

16    Q.    Do you know how many times you might have said to Ms.

17    Sekiya that she should cut her leg off?

18    A.    Oh, jokingly, maybe a dozen or two dozen times.

19    Q.    And in your opinion, is that an appropriate statement

20    for a supervisor to make to her subordinates?

21    A.    It was always during a context of conversation with

22    her when we would have -- talk about different things and her

23    -- her foot would come up now and then.  It was more of a one

24    on one personal type of a discussion rather than a job related

25    type discussion.

107

1    A.   Yes.

2    Q.   And you were in the work place?

3    A.   Yes.

4    Q.   And you were on the work clock?

5    A.   Yes.

6    Q.   So, can you please answer my question?  Was it

7    appropriate?

8    A.   No, it wasn't.

9    Q.   Yet, you admit you said it maybe 24 times?

10   A.   Twelve to 24 times.

11   Q.   Did Ms. Sekiya ever in the 12 to 24 times look hurt,

12   or upset, or embarrassed by -- by your statement?

13   A.   No.

14   Q.   She always laughed out loud or giggled?

15   A.   Well, yes.

16   Q.   But you have no witnesses to that?

17   A.   No.

18   Q.   Did you have discussions with Deputy LiliNoe Miyamoto

19   about Ms. Sekiya's foot problem?

20   A.   Yes.

21   Q.   Do you know how many?

22   A.   No, I don't.

23   Q.   More than five?

24   A.   (Inaudible.)

25   Q.   And was it she that would inquire with you or was it

108

1   you that would go to report to her?

2       A.   I would think she would be the one inquiring about it.

3       Q.   And what would she ask you?

4       A.   Normally it would be how -- how is she doing.

5       Q.   And you would know who she was?

6       A.   Well, yes, that would be (inaudible).

7       Q.   And what would you say?

8       A.   Whatever the current company that I -- I may have had

9   at that particular time.

10      Q.   And did you tell Ms. -- do you recall ever meeting

11  with Deputy Miyamoto in your office where she asked you what's

12  the results of the bone scan?

13      A.   I don't recall that.

14      Q.   On or about December 7th, 2000?

15      A.   I don't recall that.

16      Q.   And do you recall responding anything about inquiries

17  about the foot saying there was no indications yet and you

18  would see the medical reports later?

19      A.   I don't recall that.

20      Q.   Did you ever give Deputy Miyamoto any medical records

21  or certificates related to Ms. Sekiya?

22      A.   All the -- her leaves chit and any attached medical

23  certificates that's attached would be turned into the front

24  office.

25      Q.   By you?

110

1    ADMINISTRATIVE JUDGE TEATHER:  Okay.  Just a moment.

2   We're going off the record for a tape change.

3    (Tape change at this time.)

4    COURT REPORTER:  Back on the record, Your Honor.

5    ADMINISTRATIVE JUDGE TEATHER:  Back on.

6   BY MS. CARPENTER-ASUI:

7    Q.   Did you ever tell Ms. Sekiya that she -- she consider

8   regular retirement, not necessarily medical retirement?

9    A.   No, I don't recall that.

10    Q.   And do you recall asking Ms. Sekiya on or about

11  December 13th, 2000, "Can't your doctor say how long you will

12  be on crutches?  Chief Domdoma wants to know?"

13    A.   No, I don't recall that.

14    Q.   Did Chief Domdoma ever ask how long is she going to be

15  on those crutches?

16    A.   Yes, he did.

17    Q.   Do you know how many times he asked that?

18    A.   No.

19    Q.   Was it one time?

20    A.   Maybe once or twice.

21    Q.   How about Deputy Lilinoe?  Did she ask how long will

22  she be on those crutches?

23    A.   Yes.

24    Q.   And how many times did she ask?

25    A.   I'd say twice also.

111

1    Q.    And they were asking you?

2    A.    Yes.

3    Q.    So, did you say you should, in turn, ask her to get

4    the answer to report to your supervisors?

5    A.    Yes.

6    Q.    Because they would go to you and not to Ms. Sekiya for

7    the updates, right?

8    A.    Yes.

9    Q.    Did -- do you recall Ms. Sekiya ever telling you that

10   the doctor couldn't predict and she had just received cortisone

11   -- a cortisone shot and she was receiving cortisone shot

12   treatments which were -- did not appear to be helping?

13   A.    Yes.

14   Q.    You recall that.  And that she was going for a follow-

15   up visit to the doctor?

16   A.    Yes.

17   Q.    Did you ever say that she should go to try a different

18   doctor?

19   A.    Yes.  Well, no, I didn't.  We'd talked about it.

20   Q.    Um-hum.  Can you tell us what you -- what that was

21   about?

22   A.    I know maybe this is five or six months after she be

23   having the foot problems or discussed talking about her foot.

24   And when I found out that she'd told me that another employee

25   had a similar problem, and so that's when I said, "Oh, are you

112

1  using the same doctor?" and she said no.  And then the

2  discussion was, "Oh, have you think -- thought about trying

3  that particular doctor."

4      Q.   Who was the other employee?

5      A.   That'd be Ruth Kibota (phonetic).

6      Q.   Is she still employed?

7      A.   Yes.

8      Q.   Is she using crutches?

9      A.   No.

10     Q.   She got off of them?

11     A.   I never knew her when she had crutches.

12     Q.   Oh, you didn't know her.

13     A.   Well, I knew her but I didn't see her -- ever see her

14  and this was, I guess, previously, years ago.

15     Q.   And so, did you say, "Try that other doctor?"

16     A.   No, I --

17     Q.   -- or would you want to try?

18     A.   No, I just said, "Well, you might want to consider

19  another doctor."

20     Q.   Did you ever say to Ms. Sekiya, "Does this doctor know

21  what the hell he's doing?"

22     A.   I'm not sure if I may have used those exact words, but

23  --

24     Q.   Possible?

25     A.   -- it's possible.

113

1    Q.   And then, did you -- you might have followed that up

2  with, "Oh, just cut your leg off already?"

3    A.   I -- I don't recall saying that right after that.

4    Q.   Mr. Cubarrubias, and I don't know if that's the proper

5  pronunciation, testified that he heard you say that she should

6  cut her leg off and replace it with a wooden leg.  Do you

7  recall --

8    A.   I don't --

9    Q.   -- saying -- test -- did you recall saying that in

10  front of him?

11    A.   No, I don't recall.

12    Q.   You might have?

13    A.   Yeah.

14    Q.   Do you recall asking her, Ms. Sekiya, "Can't you walk

15  without those crutches?"

16        MS. CHEN:  I believe you asked that before.

17        ADMINISTRATIVE JUDGE TEATHER:  Overruled.  He can

18  answer if he recalls.

19        THE WITNESS:  Well, I don't recall.

20  BY MS. CARPENTER-ASUI:

21    Q.   You might have?

22    A.   Yeah.

23    Q.   Did you -- do you recall asking her, "Can't you use a

24  cane?"

25    A.   No, I don't recall that.

128

1  work would be piled up and she would catch up?

2      A.  Depending on what the work was, we may have had

3  someone else assist, depending on the urgency of the work.

4      Q.  But basically she would catch up or never caught up?

5      A.  Again, depending on what the work is.  I couldn't tell

6  you.

7      Q.  But you never ruled her out for being behind in her

8  work or anything?

9      A.  No.

10      Q.  And you gave her those superior performance ratings,

11  right?

12      A.  Yes.

13      Q.  Do you recall that your -- who drafted that letter of

14  requirement, you or somebody else, or what?

15      A.  It was coordinated with our Employee Relations Office,

16  Mr. Steve Buttrin (phonetic).

17      Q.  No, who drafted it?

18      A.  We both did.

19      Q.  You and?

20      A.  Mr. Steve Buttrin.

21      Q.  Did you draft it and he approve it?

22      A.  He gave me initially a sample.  I then drafted my

23  letter.  He looked at it, he chopped on it, and then we came to

24  an agreement.

25      Q.  And Mr. Steve Buttrin approved the final wording?

129

1    A.    Yes.

2    Q.    Not Mr. Domdoma?

3    A.    Yes.

4    Q.    And Mr. Domdoma is not the one who told let's write up

5    a letter of requirement?

6    A.    No.

7    Q.    Or let's put something in writing --

8    A.    Yes.

9    Q.    -- to Ms. Sekiya?

10   A.    Yes.

11   Q.    So, when you had contacted -- what prompted you to

12   contact this Steve Buttrin?

13   A.    Initially and like I said, after the March, 2001

14   direction from our DRMO chief and after I looked at the leave

15   balances of all our employees, then I contacted through Mr.

16   Domdoma Mr. Buttrin to see what we should be doing.

17   Q.    And the other employee also received a letter of

18   requirement?

19   A.    He received a verbal also in that same May 26th date

20   and he had provided the information that was requested.

21   Q.    And so he did not get a letter of requirement?

22   A.    He did not get a written letter of requirement.  It

23   was the same verbal that we had discussed.

24   Q.    Okay.  Then was he also as you knew --

25   A.    Yes.

Superior Reporting Services and Transcriptions
P.O. Box 751438
Petaluma, California 94975
(707) 763-2456   (Fax) 763-2669

001610

130

1    Q.    -- sick?

2    A.    Yes.

3    Q.    And what made his case different?  He provided

4  information and here I think she refused to give you

5  information?

6    A.    She didn't refuse.  She just didn't give it.

7    Q.    Well, what exactly in addition to what she'd already

8  given did you want from her?  That's what I'm not

9  understanding.

10    A.    I think I asked for that earlier.

11    Q.    I know.  But I thought she was providing you with the

12  leave slips and the medical certificates.

13    A.    Her -- her last --

14    Q.    Oh, oh, I'm sorry, her prognosis.

15    A.    Okay.  Then her last doctor statement was on January

16  of 2000.  And it's already 2001.

17    Q.    Did she seem -- do you know why she didn't provide

18  this prognosis information?

19    A.    No.

20    Q.    Your -- the letter of requirement said that Ms.

21  Sekiya's leave was excessive, but did you realize that her

22  leave in 2001 was actually less than it had been in 2000, '99,

23  and '98?

24    A.    No, I did not realize that.

25    Q.    And that was for annual leave and sick leave, both?

001611

131

1    A.    Both.

2    Q.    You didn't check on that?

3    A.    I didn't realize it, no.

4    Q.    Okay.  And then, at some point in 2001 Ms. Sekiya even

5    was on leave without pay, correct?

6    A.    Not that I'm aware of.

7    Q.    I can show you -- let me show you just to refresh your

8    recollection.

9         MS. CARPENTER-ASUI:  Judge, I'm going to show him Ms.

10   Sekiya's leave and earning statements for 1998, '99, 2000, and

11   2001.  Ms. Chen, this is in your white binder.

12        MS. CHEN:  What number?

13        MS. CARPENTER-ASUI:  No. 168.

14        MS. CHEN:  Oh.

15        MS. CARPENTER-ASUI:  Your -- your box.

16        MS. CHEN:  Oh, in mine.

17        MS. CARPENTER-ASUI:  Yeah.  These are the leave and

18   earning statements.

19        ADMINISTRATIVE JUDGE TEATHER:  What document -- what

20   is it?  What document number?

21        MS. CARPENTER-ASUI:  Judge, it's the -- from the box

22   you returned, the same box was given to Ms. Chen --

23        ADMINISTRATIVE JUDGE TEATHER:  So, it's not --

24        MS. CARPENTER-ASUI:  -- Chen --

25        ADMINISTRATIVE JUDGE TEATHER:  It's not in the record.

139

1    Q.   Did it become a permanent part of her record?

2    A.   I don't know.

3    Q.   Did you ever issue a letter of requirement to any

4  other employee since you've been at DLA?

5    A.   No.

6    Q.   Just once to Ms. Sekiya?

7    A.   Yes.

8    Q.   And did you ever hear of any other employee receiving

9  this letter of requirement at DLA?

10   A.   At DLA Hawaii you're talking about or just at DRMO

11  Hawaii?

12   Q.   DRMO Hawaii.

13   A.   I -- I am not aware of anyone else.

14   Q.   Did you ever receive any training on the FMLA?

15   A.   Training?

16   Q.   You know, teaching you what it means and how to advise

17  employees in the work place?

18   A.   No.

19   Q.   None?

20   A.   No.

21   Q.   Before Ms. Sekiya left or retired on October 1, '01,

22  did anyone else take FMLA at DLA under your supervision?

23   A.   Yes.

24   Q.   Who did?

25   A.   I would say Mr. Tio (indiscernible), Mr. Oscar Ovago

174

1      A.    For Fried Intelligence Center Pacific.

2      Q.    And when did you come to work at the DLA?

3      A.    About July 1975.

4      Q.    And how did you come to work at the DLA?

5      A.    It was a promotion, so I thought I would shift over to

6    another agency.

7      Q.    Shift a promotion from what grade to what grade?

8      A.    It was a four and going to a five.

9      Q.    GS-4?

10     A.    GS-4, yeah.

11     Q.    And were you a GS-5 at the time you retired?

12     A.    I was a GS-7.

13     Q.    And when did you get promoted to GS-6?

14     A.    I'm not really sure.  Maybe in the '90s, mid-'90s.

15     Q.    And then, how about seven?

16     A.    That would be the late '90s, I think.

17     Q.    Did you ever have any awards during your employment?

18     A.    Yes.

19     Q.    Um-hum.  What did you have?

20     A.    Sustained superior performance, commendable service,

21   within grade increase.

22     Q.    How about any certificates?

23     A.    Yes.

24     Q.    What?

25     A.    I believe it was joint meritorious certificate,

175

1  commendable service certificates also.

2  Q.    In the 1990s, did you have any medical conditions?

3  A.    Yes.

4  Q.    What?

5  A.    I've had migraines since the age of 10.  I've had

6  ulcer problems, gas intestinal problems, and in late '99 I had

7  foot problems.

8  Q.    And were you ever told by Chief Domdoma anything about

9  women?

10  A.    Well, back in the '80s and this is before Mr. Domdoma

11  was a DRMO chief, he had stated to me that, you know, he didn't

12  like females who stood up to him.  And at that time we were

13  just co-workers.  I mean, he was not in a management position.

14  Q.    He was a same level co-worker as you?

15  A.    Well, he was higher, two grades higher

16  Q.    When you say foot condition, what exactly does that

17  mean?

18  A.    I had a external inflammation and after the x-rays

19  they found out it was a bone spur and plantar facetious or

20  however you say it, and after that it developed into plantars

21  warts.  So it was four different conditions on that one foot.

22  Q.    And that's your right foot?

23  A.    My right foot.  My right heel actually.

24  Q.    And do you still suffer from these right foot

25  conditions?

176

1    A.    Oh, yes.  I still soak them every night and I still

2  sleep with a night splint.

3    Q.    And what about medications?  Are you still on

4  medication?

5    A.    No.

6    Q.    Okay.  And then in December 1999, you began using any

7  kind of a walking aid?

8    A.    I used two crutches.

9    Q.    And I notice now you're just using one.  When did you

10  begin using just one?

11    A.    It was about April of 2002.

12    Q.    Does that mean your condition improved?

13    A.    Yes.

14    Q.    Um-hum.  The migraine, did you have any migraines in

15  2000-2001?

16    A.    Oh, yes.

17    Q.    And how often would you say they were in 2000?

18    A.    Oh, I could get them at least once a month.

19    Q.    And how long would they last?

20    A.    they could last from three to five days.

21    Q.    And would you report for work when you had these

22  migraines?

23    A.    Not if I had the severe migraines because light,

24  sound, and any type of movement would make me nauseous.

25    Q.    How about in 2001?  Any migraines?

177

1     A.    Yes, definitely.

2     Q.    More or less than 2000?

3     A.    More.

4     Q.    And 2000, you said one time a month.  How many in

5   2001?

6     A.    At least twice a month.

7     Q.    And what duration?

8     A.    From three to five days.

9     Q.    And do you know why you had more in 2001?

10    A.    Stress.  I could just feel whenever my -- the tension.

11  It affected the muscles in the neck and the shoulders and it

12  would just cause my headaches to come on.  and it just would --

13  I guess the restriction would just cause the headache to be so

14  severe that I could not drive.

15    Q.    And what kind of triggers were there to your stress,

16  if you know?

17    A.    I beg your pardon?

18    Q.    What -- you said you suffered from stress?

19    A.    Yes.

20    Q.    And you believe that's what increased your migraines?

21    A.    Oh, yes.

22    Q.    And what was the cause of your stress?

23    A.    Well, I guess it was it started in January of 2000 and

24  I had been on leave for a month per doctor's orders, complete

25  bed rest, staying off my foot, and having my supervisor call me

178

1   almost on a daily basis.  That started to trigger a lot of
2   things.  I could barely get to the bathroom because I was in so
3   much pain.  I couldn't get to the kitchen to get a cup of
4   water.  And there were times that I actually crawled on all
5   fours to go to the bathroom.
6       Q.    This is related to your foot problem?
7       A.    Yes.  And I was on maximum pain killers.
8       Q.    What does that mean?
9       A.    Medication to make me drowsy to let me go to sleep so
10  I wouldn't feel the pain.
11      Q.    Now, you heard Mr. -- Supervisor Ching say he only
12  called you one or two times.  Would you -- you disagree with
13  that?
14      A.    I definitely disagree with that.  It got to a point
15  where I was just cringing every time the phone rang because it
16  was such a chore for me to even get out of bed.  I mean, I
17  could not get out of bed like a normal person, and that was a
18  chore, just as much as it was a chore to even get to the
19  bathroom.
20      Q.    When he would call you, what would he say?
21      A.    Well, he would start off like asking me, "Well, how's
22  your leg?"  And I would say, "Well, it's still the same and I'm
23  still in pain."  And he would continue to talk sometime of
24  really no importance to work, but it would always end up with
25  the remark, "Well, just cut your leg off."

179

1    Q.    Is that when he first started saying it in January of

2    2000?

3    A.    Oh, yes.  Yeah.  Um-hum.

4    Q.    And what would you say in response?

5    A.    Well, it -- I could feel my blood pressure going up.

6    I could feel my body tensing up.  And at that point, it would

7    also create headaches.  But it's just the mere thought of

8    having my leg cut off.  I mean, I would literally cringe.

9    Q.    Did you think it was funny when he said that?

10   A.    I was in too much pain, no.

11   Q.    Did you ever think it was funny when Mr. -- Supervisor

12   Ching said that to you?

13   A.    Well, no.  No, it was not a joke.

14   Q.    How do you know it was not a joke?

15   A.    He had a very sarcastic tone when he would say that

16   and that remark was repeated to me so many times that it -- it

17   was very cruel, very hurtful, that I'm just wondering, I don't

18   know, you know, how anybody could say that to someone who's in

19   pain.  I mean, I was crawling on all fours.

20   Q.    Okay.  Now, you returned to work after the one-month

21   off in January?

22   A.    Yes.

23   Q.    And you continued to use the two crutches to do your

24   job?

25   A.    Right.

181

1    A.    Yes.

2    Q.    What would he say at work once you returned?

3    A.    He asked me, "Do you have a doctor's paper?"  I said

4    yes, and I provided the doctor's paper.  But even while I was

5    off in January, I have sent him a medical certificate updating

6    him to my condition and my follow-up doctor appointment dates.

7    Q.    You said when he would call you he would ask about

8    your leg.  Was anything wrong with your leg?

9    A.    No.  No.

10   Q.    Are you sure he said leg?

11   A.    Sometimes he said led.  Sometimes he said foot, you

12   know.

13   Q.    Did there come a time when Supervisor Ching asked you

14   about what your co-workers might think about preferential

15   treatment?

16   A.    He did make that statement.  I have never heard it --

17          ADMINISTRATIVE JUDGE TEATHER:  I didn't hear the

18   answer, Ms. Sekiya.

19          THE WITNESS:  Oh, oh.  Yes, Godfrey did inquire about

20   that.

21          ADMINISTRATIVE JUDGE TEATHER:  About what?

22          MS. CARPENTER-ASUI:  That co-workers may be thinking

23   she was getting --

24          THE WITNESS:  -- preferential treatment.

25   BY MS. CARPENTER-ASUI:

182

1    Q.    Did he ask you when you anticipate recovery?

2    A.    Yes.

3    Q.    And when you anticipate permanent recovery?

4    A.    Yes.

5    Q.    And what did you answer?

6    A.    I said I didn't know.  And the doctors could not even

7    give me a projected date because I was not healing like a

8    normal person.

9    Q.    And did they say why?

10    A.    Every person is different and the healing recovery

11    rate varies.  And one of the things that I did bring up to

12    Godfrey, and this is something that goes way back when, when I

13    say I don't heal like a normal person, it's like when I had my

14    son, I only have one son, I was out for six months because for

15    four months I could not drive.  I did not heal like a normal

16    person.

17    Q.    Were you ever told anything about your slow healing

18    process?

19    A.    It was something that began when I was a year and a

20    half old.  I have scars on my right foot where I stepped into

21    hot boiling water and actually I never, you know, had like a

22    normal diet, and from then on it was like my recovery for

23    anything and everything that I had was always slow.

24    Q.    Did Supervisor Ching say anything else to you such as,

25    you know, your condition has been too long?

183

1    A.    Oh, yes.  Um—hum.  He felt that it was going on too

2  long.  He gave me the impression that, you know, if like maybe

3  I was dragging it on, wanting to stay on light duty, but it

4  wasn't the case.  I mean, I just didn't heal.

5    Q.    And he asked you if you needed the crutches?

6    A.    Yes.  And I said definitely.  There was no way that I

7  could stand on this right foot.

8    Q.    Do you recall Supervisor Ching saying that Chief

9  Domdoma thinks you're faking or dragging this along?

10    A.    Yes.

11    Q.    And what did you say?

12    A.    I didn't say anything.  I just nodded my head because

13  it wouldn't surprise me that that's what he was thinking.

14    Q.    And at some point your father became ill?

15    A.    Yes.  In November of 2000 he was diagnosed with

16  cancer.

17    Q.    Did you tell anyone at work that your father was

18  diagnosed with cancer?

19    A.    Yes, I told Godfrey when I went back to work.  And I

20  told him that my father has just been diagnosed with cancer and

21  I would need to take leave to care for him because I was the

22  only child on the island.  I said I have a brother but he's,

23  you know, on the Mainland, so I was the only one available at

24  that time.

25    Q.    Are there any other relatives that could have cared

190

1    A.   Because I was scheduled for nuclear x-ray to see if

2 there was any fracture or why I wasn't healing properly.

3    Q.   And did he say anything when you told him about the

4 bone scan?

5    A.   He did say make sure that we get the results which

6 they did.

7    Q.   You gave it to them?

8    A.   I had a doctor write it on the certificate what the

9 results of the x-ray was.

10    Q.   And you gave it to Mr. Ching?

11    A.   Godfrey Ching, yes.

12    Q.   Do you know what exhibit tab that is off the top of

13 your head?

14    A.   It might be under Dr. Michael --

15    Q.   That's okay.

16    A.   Dr. Chun.  Dr. Chun.

17    Q.   That was Dr. Chun?

18    A.   Yeah, Dr. Michael Chun.

19    Q.   And you handed it to Supervisor Ching?

20    A.   Yes.

21    Q.   When you were talking to Supervisor Ching about the

22 bone scan, do you recall him saying anything about cutting your

23 leg off?

24    A.   He may have at that point.  I mean, he -- it's been

25 said continuously for a year and nine months, from January 2000

001671

191

1    up until the time I retired.

2        Q.    Would he say it just when the two of you were alone in

3    private or --

4        A.    Most of the time it was, yes.

5        Q.    And did he ever say it in front of your co-workers?

6        A.    Co-workers may have overheard, yes.

7        Q.    Did any of them ever say anything to you when he said

8    that?

9        A.    I'm sorry?

10       Q.    Did any -- did you ever speak to any of your co-

11   workers about that comment, "Just cut your leg off already,"

12   being said?

13       A.    Oh, yeah, yeah.  I -- I -- I felt so humiliated.  It's

14   just a degrading remark and I thought it was so unprofessional

15   coming from a supervisor especially and I really didn't

16   appreciate it, not one bit at all.

17       Q.    You heard Mr. Bowman ask if you stand up for yourself.

18   Did you ever tell Supervisor Ching, you know, "Don't say that

19   to me again," or anything like that?  Did you ever threaten to

20   turn him in or --

21       A.    I told him to shut up a number of times.

22       Q.    Well, how many times did you say shut up?

23       A.    Well --

24       Q.    And was it always in a response to that comment or was

25   it --

192

1    A.    To that main comment, I mean, just cut your foot off

2 comment, that's what I didn't like.

3    Q.    And when he would say that what would he say back?

4    A.    He would just kind of shrug and do this smurk, you

5 know, like it's not a big deal and why are you getting so

6 upset.

7    Q.    Do you recall on or about December 7th, 2000 being

8 told if the Doctor sees no sign of improvement you should just

9 consider medical retirement?

10    A.    Yes.

11    Q.    Now, Supervisor Ching denied saying that.  You heard

12 that testimony?

13    A.    Yes.  And I totally disagree because I can recall him

14 standing in front of my desk talking to me about medical

15 retirement and a couple of days later he did the same thing.  I

16 mean, maybe he didn't know numbers, but he talked about it and

17 he said, "If your leg is not getting better, why don't you go

18 for medical retirement," and that was not in my mind at that

19 point.

20    Q.    Then why didn't you go for medical retirement?

21    A.    My son was in college.  I felt that I could still work

22 and my intention was not to retire that soon.

23    Q.    When did you plan to retire?

24    A.    October of 2004 after my son graduated from college.

25    Q.    Could you have afforded to -- withdraw that.